# CHARLESTON.

W. B. WOODRUM *et al.* v. J. B. BURTON *et al.*
and
W. B. SKAGGS *et al.* v. W. E. YATES.

Submitted January 19, 1921.    Decided March 22, 1921.

1. RELIGIOUS SOCIETIES—*Equity May Enquire into Ecclesiastical Beliefs Only Where Civil or Property Rights Involved.*

Only when civil or property rights of a religious organi·

zation form the basis of the relief sought can a court of equity inquire into the ecclesiastical beliefs peculiar to the organization.  (p. 328).

2.  SAME—*Departure from Doctrinal Beliefs to Justify Exclusion from Church Property Must Be Vital and Substantial.*

Where one of two church factions excludes the other from the church property on the ground of departure from the doctrinal beliefs of the organization, for the advancement of which beliefs a trust was impressed, expressly or impliedly, by the deed originally conveying the property for church purposes, the departure, to warrant the exclusion, must be vital and substantial.  Refined doctrinal distinctions are not sufficient for that purpose.  (p. 339).

3.  SAME—*Decision of Church Councils As to Doctrine Not Conclusive On Minority's Right to Control Church Property Unless Assented to.*

The decision of associations or councils of Baptist churches, whose form of government is purely congregational, that doctrines adhered to by a majority of the church membership conflict with the fundamental Baptist doctrinal beliefs, is not conclusive upon the question of the right of the minority to control the church property, unless the decision directly or impliedly is assented to by the parties interested, or accepted and adopted by a majority of the membership of the church present and participating in a church business meeting called for that purpose, upon due and sufficient notice.  Such associations and councils are mere voluntary and advisory judicatories, and their findings have no conclusive effect.  (p. 333).

4.  SAME—*Advisory Reports of Church Councils Not Binding When at a Special Meeting Without Due and Reasonable Notice and Substantial Compliance With Rules and Regulations.*

Courts of law do not regard the action of an independent religious organization, in accepting the advisory reports of its church councils, as final and binding, when taken at a special meeting without due and reasonable notice to the membership of the general nature and purpose of the meeting, and substantial compliance with its rules and regulations, if any it may have, relative to such action.  (p. 337).

5.  SAME—*Wrongful Seizure of Church Property by Minority Held a Sufficient Basis for Equitable Relief.*

The wrongful and violent seizure and retention of the property of a church of a congregational form of government by

88 W. Va.

a minority of its members, to the exclusion of the majority and contrary to their expressed wish, furnishes a sufficient basis for the award of equitable relief. (p. 339).

6.  SAME—*Enforcement of Discipline in Revival Services in Baptist Church Held Within the Power of the Organization.*

Enforcement of appropriate decorum or discipline in the progress of revival services in a Baptist church, wherein the only requirement is the avoidance of undue emotional excitement, is peculiarly within the power of the organization, as this disregard of the unwritten regulation affects only the internal affairs of the society, and courts will not interfere except where its violation assumes such proportions as to effect a forceful exclusion of the major portion of the society against their will. (p. 340).

Appeal from Circuit Court, Summers County.

Suits between W. B. Woodrum, W. E. Yates, and others and J. B. Burton and others, and between W. B. Skaggs and others and W. E. Yates. The suits were heard together, and from a decree refusing the relief prayed for by Woodrum and others against Burton and others and granting the relief prayed for by the latter against Yates alone, Woodrum and others appeal.

*Reversed; injunction reinstated and perpetuated.*

*Dillon & Nuckolls,* for appellants.

*W. H. Sawyers, C. O. Dunn, Marcum & Shepherd, Blue & McCabe* and *Harry V. Campbell,* for appellees.

LYNCH, JUDGE:

The decree complained of upon this appeal, entered October 22, 1920, in two suits heard together, refused the relief prayed for by Woodrum, Yates and others against Burton and others, and granted the relief prayed for by Burton and others against Yates alone. The parties to both suits are or claim to be the constituent members of the First Baptist Church of Hinton, and as such entitled to occupy and use the property of the organization for religious services according to the faith, practices and customs of Baptist churches in general. The property consists of a lot, a church building and parsonage on the lot. Although the deed for the lot

does not specify the form of ecclesiasticism to which the property is to be devoted, there is no controversy as to the right of the local Baptist organization to control the uses for which the property was purchased.  The trustees who were the grantees in the deed, and those of them who are still living, and the successors of those who are dead, if any, have been and still are Baptists.  The same fact applies also to the congregation worshipping in the church.

In January, 1918, Rev. W. E. Yates, then about 29 years of age and a student in college preparing for the Baptist ministry, was elected or employed to serve the congregation as pastor, without limit as to time, and in March entered upon the discharge of the duties pertaining to the office.  As he had done before, during his pastorate after the employment, so on January 4, 1920, he began and until April 14th regularly continued a series of revival services, and as a result of his activities in this respect  increased  the numerical strength of the congregation.   Until sometime towards the last of March no member of the church complained or objected to the progress of the meeting or the manner of conducting the services.   The bases of the complaints and objections that then arose were that Yates and others, who for convenience are referred to as plaintiffs, and for the same reason those in opposition to them as respondents, had in his preaching departed from the true Baptist doctrinal beliefs, practices  and custom by his denunciation of them from the pulpit, and from the usual Baptist methods of conducting revival services.

There was on April 14th a voluntary suspension of the services begun in January to be resumed four days later.  Within this interval respondents Burton and seven other members of the deaconate, four of the body not joining therein, and two of the three trustees, sought an interview with Yates, avowedly for the purpose of dissuading him from resuming the services, and from conducting them or permitting them to be conducted as he had done if he did resume them as contemplated.  These overtures he promptly repelled in terms more exasperating than necessary, but he did offer to submit to the determination of the congregation all matters of differ-

ence between himself and other members of the church, whatever form the accusations might take. This offer Burton and others declined to accept, but at once directed the deputy sheriff of the county, then present by their procurement, to place chains and locks upon the church buildings, except the parsonage, then and now occupied by Yates, and to station guards upon the lot with direction to prevent plaintiffs from entering upon the property for any purpose connected with the ministration of his pastoral duties and privileges.

To procure a mandatory injunction order requiring the removal of these obstructions and to obtain permission to prosecute the services thus interrupted, Woodrum and others instituted the first suit and presented the bill to the judge of the circuit court of Summers County in vacation and moved him to award the writ. This he declined to do and endorsed his refusal upon the bill, but members of this court, as authorized by law, did grant the conditional or temporary order, which, upon final hearing upon the merits, the circuit court dissolved.

Then ensued congregational meetings alternatively assembled and held by plaintiffs and respondents, each faction ignoring the other. Respondents, without notice to plaintiffs or invitation to join in the call, sent "letters-missive" to neighboring Baptist congregations named in the call asking the appointment of "messengers" to constitute a Council with authority to hear and determine the rights and duties of the active participants towards each other and to the local organization. There were two such Councils, the first convened pursuant to call on April 26, 1920, the other on May 14th. Yates, though notified and requested to do so, refused to attend and did not attend either of them, pursuant to the advice of his counsel, that advice being predicated upon the pendency of the suit in the civil court.

Nevertheless, both Councils proceeded to perform the duties for which they were convened, and, perhaps because of some irregularity in the first call, the second Council accepted and adopted as part of its report the findings of the first. The substance and effect of the report filed was an expression of

regret because of the failure of Yates to attend the Council meetings with his witnesses and lay before each of them an account of his activities and any defensive matter he had to show innocence on his part; a declaration that he had unjustly censured Baptist doctrinal beliefs, custom and practice, and denounced those whose views did not accord with his; and their grave concern on account of the discredit and reproach thus brought about to the Christian faith as represented by Baptists. Then followed its conclusion that plaintiffs are not entitled to occupy and use the church property, and that the physical condition of Yates was such as rendered him incapable of sane and constructive Christian leadership. Finally it incorporated these "advisory" recommendations: The dissolution of his pastoral relation to the local organization; the revocation of his ministerial license; the withdrawal from him of Christian fellowship; condemnation of his teachings and practices as inharmonious with the principles and practices of Baptists; and that respondent and especially the eight of the twelve deacons and two of the three trustees and those associated with them in the call for the Councils and in the request for the resignation of the pastor, be recognized as the First Baptist Church of Hinton, and as such entitled to control the use of its property.

This report the Council convened May 14th filed with Burton and others associated with him as deacons and trustees on the same day, probably sometime in the afternoon, and later on the same day sixty-four members of the organization, being part of those so declared to constitute the church, assembled pursuant to a notice published May 11, 12 and 13, and, it may be, personally served upon Yates, and adopted the report and all of its recommendations. None of the plaintiffs or those sympathizing with them were present. The notice was of the most general character, saying in effect that the purpose of the meeting was the transaction of such business as was proper to transact at a regular meeting of the organization. It said nothing about charges of irregularities in Baptist procedure or denunciation of Baptist faith or prac-

tices, or of an intention to hear and act upon the report of the Council.

Then, as if by way of the maintenance and preservation of his pastoral rights and privileges, Yates convened a like assemblage of the church membership, pursuant to a notice also published in the local newspapers and by circulars distributed generally throughout the city and personally served upon the deacons and trustees. As thus disclosed, the purpose of the meeting was to hear evidence and determine whether he had in his teachings departed from Baptist doctrinal belief and custom, or pursued practices or advocated doctrines inconsistent therewith, and whether the congregation should dissolve the pastoral relation theretofore existing between them. Joining with him in the call for the second meeting and participating in it were 143 members of the organization, including four of the deacons and one trustee, and they without a dissenting voice exonerated him from disloyalty to the teaching, preaching, practices and customs of Baptist churches. Thereupon respondents brought the second suit, although they had filed in the first an answer specifically denying the material allegations of the bill filed by Woodrum and others and setting forth new matter, and on such matters prayed affirmative relief. The two pleadings differ for the most part only in regard to the actions of the Councils, of which more will be said in another connection.

It may not be amiss now to express some doubt upon the right of a civil court to entertain jurisdiction of the controversy, limited as such jurisdiction is in cases of this character. For clearly, as all the authorities dealing with the subject agree, there is no such jurisdiction to determine ecclesiastical doctrinal beliefs unless civil or property rights are involved. The fundamental question therefore is whether the facts detailed are sufficient to permit the exercise of judicial authority in determining the right to control the use of the property of the local organization. If so, then our duty is plain. If not, the congregation must settle its own difficulties in its own way or by its own methods. It is only when and where such right of control is challenged that the remedial power of a court of equity can be invoked. Whether this is such a case

is to be determined later. It is broached now solely for the purpose of furnishing a clearer comprehension of this discussion as it proceeds. But for the contention of respondents predicated upon their pleadings and proof that the facts are sufficient to warrant relief to them, that question might properly be decided now without further investigation.

In view of this contention it seems necessary to inquire, and if possible to ascertain what are Baptist doctrinal beliefs, customs and practices, and what one or more of them Yates has apostatized or departed from in his teachings or otherwise. The first inquiry is solved for us by Hiscox in his The New Directory for Baptist Churches, a competent authority on the subject, as counsel agree. These beliefs, he says, are Calvanistic as distinguished from Arminian and conform to the general conception of the unity of the God-head; the equal divinity of the Father, Son and Holy Spirit; full and free salvation; atonement and redemption through the meritorious sacrifice of Christ; justification by faith, not by works; the necessity of regeneration in order to salvation; the function of the Holy Spirit in saving faith and sanctification; personal selection of believers; perseverance of the saints by upholding grace; the resurrection of the body; the life everlasting, and the endless duration of rewards and punishment. This statement, though not in the exact language of the author, is sufficient to show the fundamental Baptist theological views.

The second branch of the issue requires the ascertainment of the extent to which Yates has so far departed, if at all, from the true faith and doctrines as set forth by Hiscox, such as will warrant a court of equity in denying him the right further to serve the congregation, a substantial majority of which, as heretofore disclosed, have expressed their purpose to retain him in his present capacity. A brief examination of the characteristics of the denominational organization is necessary. Like all other churches of the Baptist persuasion, it is independent; it acknowledges no superior temporal authority; there is nowhere a recognized supervisory power; each organization reserves to itself the right to control, as it pleases, its internal affairs without molestation or interference from any human source whatever; and the denomination as a

whole has no judicatory with power to interpose its aid or assistance in the adjudication of schismatic differences when they affect such an independent organization, with the exception hereinafter noted.

Nowhere in the more than three thousand pages of proof and pleadings is there to be found any serious or successful attempt to identify any one or more, less than all, of such beliefs, practices and customs against which Yates inveighed publicly or privately or apostatized on any occasion. There is no such identification in the resume of the evidence as our rules require—none in the reports of the Councils, and we have found none elsewhere. If counsel actively engaged and interested in the full development of the controversy from their point of view cannot locate in the record the proof on which they base their right of relief, no duty requires such investigation and search on our part, though we have attempted to find such proof. When we look to the testimony of Drs. Wood and Johnson on one side and Rev. Yates on the other, each of whom, when testifying, seems to be intelligent, rational and frank as a witness, we fail to discover any substantial divergence between the views maintained and held by them in regard to the essentials of Baptist doctrine as laid down by Hiscox.

To illustrate, Dr. Wood defines sanctification, as understood by Baptists, to be the work of grace carried on in the heart of the believer in the Holy Spirit, beginning at the moment of his conversion and continuing until he is transformed into the image of Christ. If there be any difference between this definition and that of Yates, it is not that they differ in beliefs on the subject in general, but in degree only. This qualification is necessary because there is an entire absence of proof of a positive nature obviously showing a real conflict between the two ministers, even according to counsel. It is true, that in an answer to a question based to some extent upon an assumption, the witness does not concur with Yates. This is the question: "It is shown in evidence in this case that W. E. Yates, in his preaching and exposition of the Baptist doctrine on the subject of sanctification, represents and teaches that sanctification is a second

work of grace, or something which, like salvation, comes instantaneously, or a work complete in itself;" to which he replied: "That is not the Baptist position." Wherein lies the basis for the assumption we are not advised. If Yates testifying is Yates the pastor, and his views in one capacity are the same as those in the other, and counsel for respondents say they are not, he is orthodox upon the question of sanctification as a witness, so far as we are able to discern. For in the latter capacity he furnishes a detailed exegesis of that doctrine, as follows: "The Baptist doctrine, and the one which we believe and preach, is that sanctification is the gradual, progressive unfolding and development of the spiritual nature, by which one partakes of the nature of God; and we also hold that no one can be sanctified in a moment or a day or a week or a month, nor a year, but that sanctification in its full meaning and power is for a lifetime." In substance and effect these three witnesses agree, or at least do not disagree, so far as we can perceive. But counsel for respondents choose rather to predicate their theory of departure upon the testimony of witnesses hostile to Yates than upon his testimony as witness in his own behalf. But testimony even from that source seems to be wanting. If it is in the record, counsel have not pointed it out and presumably it is not here. In any event we have not found it.

It is suggested also that Yates does not have the right conception of the Baptist doctrine of regeneration, although as a witness he says it "is the direct operation of the Holy Spirit upon the mind and heart of man, by which man is changed in his nature and purpose and motive, and made a new creature in Christ Jesus." Then as to repentance he says it "is a Godlike sorrow for sin, brought about by the conviction of the Holy Spirit, a sorrow which is deep enough and strong enough to cause one to turn his mind from sin and turn to God, to separate himself from sin and look to Christ for salvation. In repentance one turns his thought from sin to God purposefully and consciously. and has a hatred for sin and everything that is unholy." Wherein this definition fails to represent the true Baptist position, or Yates preached a contrary belief, the record furnishes no adequate informa-

tion.    In this manner, if reasonably required, every Baptist
belief might be examined and inquired into for lapses from
the faith of Baptists with the same result, without the least
effect upon the attainment of certainty in any particular
wherein there appears to be any reasonable foundation for
the charge of delinquency in the ministration of Yates, so
far as relates to any specific abandonment by him of the ar-
ticles of Baptist faith.

In order to broaden the scope of the investigation, counsel
for respondents assail the ministration of Yates on the more
general charge that, although he may not have apostatized
as to any particular creed or tenet dear to Baptist believers,
yet he has indiscriminately inveighed against all of them in
that he has frequently said:    ''To H—— with Baptist doc-
trine; to H——with close communion.''    Though he denies
the frequency of the use of these inelegant and acrimonious
terms, in which denial he is supported by a majority of the
witnesses examined, whose testimony, when weighed in the
balance against that of others who say he did, seems to be en-
titled to equal credit, yet  he admits their use only as quota-
tions from some Southern Baptist minister, and not as ex-
pressive of the sentiments entertained by him.    In other
words, he says he thereby sought to illustrate his conception
of the duty of himself and his hearers to decide as between
man-made creeds and the teachings of the New  Testament,
when the former conflict with the teachings of the latter, it
being the acknowledged and accredited source of all Baptist
doctrinal beliefs.

Every one is aware of the readiness with which partisans
of contestants in a litigation of this kind, or any other kind
for that matter, misrepresent or unduly distort or exaggerate
public or private discussions or conversations  on the one
hand, and on the other, by way of attempt to escape from
their full force and effect, minimize them, even  when they
may honestly misconceive them, especially when embittered
by passion and prejudice.    The facts of this case afford am-
ple illustration of such a regrettable instance, not by one
faction alone  but by both.    It is, however, extremely sin-
gular that any minister should speak in such denunciatory

terms of and concerning the faith of the church of his choice, and to whose beliefs he avowed and pledged loyalty and devotion when commissioned to expound them as understood and taught at the time of his consecration in such capacity. To overcome this presumption in favor of such a minister, the proof should be fairly convincing, not merely persuasive. That burden rests upon those who charge the existence of such radical departure from the true faith.    Besides, if we should agree with the Supreme Court of Alabama that ''it appears to be well established'' that Yates did use the terms attributed to him, inelegant as they are, that alone does not necessarily disclose a purpose on his part to divert the church property to the promulgation of doctrinal beliefs inconsistent with its original dedication.    Rather it merely becomes a matter of refined taste, decency and good order, and as such to be judged by the congregation itself.    *Manning* v. *Yeager,* 203 Ala. 185, 82 So. 435.    These observations apply alike to both expressions, with this addition, however, as regards the close communion ordinance or practice—it is not enforced now with the same degree of strictness as it formerly was, and many eminent Baptist divines and laymen have become more liberal and less inclined to its strict observance.

Again, as if by way of supplying the omission of proof necessary to sustain the decree, respondents urge that the findings of the Councils furnish an adequate basis for the relief granted by it.    There are, it is true, some religious organizations that do have jurisdiction for the settlement of internal disagreements, including those affecting property rights, and when so settled civil courts will not interfere, except when the solution is grossly unjust or the decision fraudulently is obtained.    Otherwise the findings are conclusive and final.    Not so, however, with Baptist councils, as we shall see, unless they are mutual councils, that is, councils called by both factions with the implied understanding and frequently with the express agreement to accept the result of the proposed investigation as the final adjudication of the controversy.    But without such concert of action or agreement the findings of even mutual councils generally are merely advisory and not conclusive of the rights of the parties,

and those of an ex parte council seldom are given as much consideration as the former. This difference is implied in the terms used to differentiate the one from the other. Mutual means a full hearing of both parties and is in the nature of a voluntary submission to arbitration, each party joining in the call for the council. In the second there is only an ex parte hearing, and that too by those in whose selection one of the parties has not participated either in the call for the council or in its proceedings.

In *Monk* v. *Little,* 122 Ark. 7, "a dispute arose in the congregation of a church of the Primitive Baptist denomination; a council of the denomination met and undertook to adjust the differences. Held, the congregation being the governing body of the church, and the council being a voluntary organization, its action, being only advisory upon the congregation, was not controlling, the congregation not having agreed to abide by the decision of the council." In this manner, as well as in the opinion, it appears that although the call was the act of the congregation itself, yet what the council so convened did was without effect in the determination of the controversy as to the right to regulate the use of the church property. *Arthur* v. *Northfield Parish Congregational Society,* 73 Conn. 718, contains an elaborate discussion of the force and effect to be given to the ruling of church councils, both ex parte and mutual. It dealt with an action at law, the deposed pastor being plaintiff and the church itself defendant, to recover his salary due either at the time of his amotion or accruing thereafter, he having held himself in readiness to serve the congregation in the meantime. The society had formulated and adopted a constitution for its guidance and government and required the submission of all difficulties distracting the congregation to be determined by councils. There was this provision: "In the settlement of a pastor the church shall act by an ecclesiastical council called in the usual manner, and such council shall be mutually called by the pastor and the church to act upon the question of his dismission, whenever the pastor shall desire it, or the church shall so vote in a meeting notified on the preceding Sabbath for that specified purpose." Of these provisions

plaintiff was aware at the time of his employment, as he also later was of the charges pending against him in the nature of moral delinquencies, such as misrepresentations, immorality, tyranny, intimidation of members in the exercise of their right to vote, thereby preventing them from voting in church meetings and otherwise depriving them of their rights as members of the church, and general unfitness on his part for the performance of his pastoral duties. Those of the members who joined in the charges requested the congregation to unite in calling a mutual council to investigate his past record and all his relations with the church since he became pastor and advise what ought to be done in the premises. This request the congregation refused to consider until it had ascertained for itself whether the facts warranted such course. Some of the accusers of their own motion sent "letters missive" to designated churches asking for the selection of "messengers" to form an ex parte council. Later, however, the church and plaintiff did unite in the call and the council convened and both parties appeared and presented their claims with witnesses to sustain them, thus again in effect creating a board of arbitration, whose award had many of the elements of finality. The court, having found the proceeding to be regular and usual and in accordance with church customs and that the plaintiff had concurred in the call and participated in the hearing, held that the defendant (congregation) by accepting its (the council's) advice, became authorized to sever the pastoral relation, and that it could not be said that any principle of substantial justice was violated in upholding such usage, nor that plaintiff had been condemned by a tribunal to which he had not expressly subjected himself. In other words, the view of the court was that as there had been a fair trial, a full hearing upon the merits in the presence of and with the acquiescence of both parties, the verdict precluded further inquiry into the merits of the dispute.

*Smith* v. *Pedigo,* 145 Ind. 361, 19 L. R. A. 433 and 32 L. R. A. 838, relied on by both plaintiffs and respondents, was twice before the supreme court of Indiana, the second time on a petition for a rehearing, and, though apparently in-

clined to consider the decision of a Baptist association of churches, the church affected being a member, as having weight upon the questions in issue, yet an examination of the opinion shows that both factions applied to the association for recognition as the true representative of the church organization. The language of the court is: ''The decision of an association of churches to which both factions of a church belonging to the association have submitted their claims, even if merely advisory, is entitled to great weight in the court on the question of religious doctrine, discipline, faith and practice.'' *Mount Zion Baptist Church* v. *Whitmore,* 83 Iowa 138, 13 L. R. A. 198, is but another illustration of the limitation upon the rule contended for by respondents. In the call for the council this language is found: ''For the sake of peace and harmony, and for the glory of our common Lord, it is hereby agreed that the findings and recommendations of this council shall be accepted as final.''

In their brief counsel for respondents seem to have confidence in the decision in *Mack* v. *Kime,* 129 Ga. 1. It involved a schism in a Presbyterian church, a branch of an organization that has its own system of judicatories, whose findings do have peculiar weight in courts of law, and the latter ordinarily will not reverse what the former have done in the exercise of the power conferred upon them. Also in *Bouldin* v. *Alexander,* 15 Wall. 131, the rights of two groups of a colored Baptist society were involved in the decision. Each group claimed to be regular members of the church, and Baptist councils and a Baptist association recognized them as such. The court said: ''That body (referring to the association), it is true, was not a judicatory. Its action was not conclusive of any rights. But the fact that the complainants and those acting with them applied for recognition as the Third Colored Baptist Church, and that the association thus recognized them, is persuasive evidence that they were not seceders and that their rights have not been forfeited.''

Thus there appears to be a general unanimity of judicial opinion that before the conclusion of a church tribunal, by whatever name it is known, shall preclude further inquiry

by civil courts, where civil or property rights are involved, the parties must have voluntarily subjected themselves to the jurisdiction of the church tribunal. This of course they may do upon becoming members of an organization whose constitution or laws so provide or require, or by uniting in the call for a council to determine the issues, or by voluntarily appearing before it and presenting for its consideration the testimony relating to the issues between them. But some courts at least impliedly hold this mode inadequate unless the parties agree in advance to abide by the adjudication. This holding is in harmony with the declaration of Hiscox, whose work we have cited. For he says the conclusions of a mutual council are at best only advisory. By that statement he clearly means that those at whose instance the council convened may elect to act favorably upon the report, or reject it altogether, as they may determine. It therefore must necessarily follow that the conclusion of an ex parte council is less persuasive, notwithstanding a few courts may concede some effect to both. But such cases are rare. Upon what evidence the councils, which in this case did convene, acted there is nothing to show, unless it can be assumed that they had before them and considered the testimony now here, indefinite and indecisive as it is.

Moreover, the church business meeting which convened May 14th and adopted the findings and recommendations of the council of that date was not properly convened by the giving of such notice as would reasonably inform the membership of the nature of the business to be transacted upon that occasion. The notice reads: ''The object of this meeting is for the transaction of any and all business that may legally be transacted at a regular congregational meeting of the members of said church. All members of the First Baptist Church at Hinton in good and regular standing are hereby respectfully notified to attend and participate in this church meeting.'' There is nothing here to inform the membership that there would be binding action taken upon questions relating to Baptist faith, doctrine and practice, the severance of the pastoral relation with Yates, and the pro-

posed excommunication of a substantial proportion of the membership. If proper notice had been given and plaintiff and his adherents then had remained away, respondents could, with better grace, assert that the church, by appropriate action, had accepted the advisory findings and recommendations of the council and by doing so had given to them binding force and effect. But in the absence of proper notice, no such effect can be attributed to them.

There is, however, at least some warrant for the opinion that respondents rely less upon departure from Baptist faith by any part of the church membership, including Yates, than upon another feature of the case, one as to which the great volume of the proof for the most part relates, that is, the manner of conducting the revival services during the latter half of March and until April 14th. Except during this interval no cause of complaint existed on the part of the membership. The services, they say, were orderly and satisfactory in every particular and nothing occurred to wound the sensibilities of any member of the congregation. As to what later occurred, there is a wide divergence of views among the witnesses, numerically about equally divided and equally entitled to credit, no attempt being made to impeach their veracity except in so far as each has by his own version contradicted others who testified in favor of the opposition. No one can impartially read and consider the testimony, contradictory as it is, without being convinced that sometime during the last of March and until the 14th of April the services properly could be characterized as peculiarly demonstrative and exciting. But conceding the characterization to be justifiable, in any view of the case as developed by the parties, could the circuit court, as it did, and this court, as it is asked to do, assume jurisdiction to adjudicate the matters in issue without invading a jurisdiction that belongs solely to the eccleciastical body itself, unless there is disclosed with reasonable certainty some intention on the part of plaintiffs to deprive respondents of their rights to enjoy to the fullest extent the purpose for which the property was acquired and to which it was devoted?

No nice distinction or shades of opinion on doctrinal points or modes of service merit the interference of a court of equity. To warrant or justify its interposition, the objection must be substantial and well sustained and amount to a diversion of the property from the trust impressed upon it by the deed. According to the testimony of Drs. Johnson, Dakin and Woods, there is no definitely prescribed standard from which may be determined what is or what is not the appropriate manner of conducting services in Baptist churches. The nearest approach to standardization or regulation is the unwritten requirement for the avoidance of unseemly emotionalism and rather an appeal to the judgment of the congregation as distinguished from the purely idealistic or emotional nature. Though not the exact language of the witnesses, that is their meaning as we have interpreted it. So that, as there is no inflexible rule for the guidance of all Baptist ministers alike, it necessarily follows that each pastor of that denomination may determine for himself the character of the services conducted by him, with this qualification that if he transgresses the requirements of propriety and orderliness, the society he serves may call him to account. It can exercise the authority and exert the power to restrain him within proper bounds, and if necessary dissolve the relation existing between them as pastor and people. To this method of settlement Yates proposed to submit the grievances that had arisen between him and the respondent, before this litigation had begun. This offer they promptly and unceremoniously rejected, and, as if by way of resentment of his refusal to surrender his pastoral rights and privileges at their command, they caused the property to be barred against him, except as to the parsonage, and the possession of this also they likewise conditionally demanded.

Notwithstanding this action, plaintiffs have at no time undertaken to curtail the rights of respondents in respect to the property of the church or divert it to uses inconsistent with the purpose of its dedication. What plaintiffs did and all they have attempted to do was to apply to the secular courts for redress, a remedy the organization could have en-

forced if his demand had been heeded. It possessed the right and the power to compose the difficulty, if it had been invited to do so. Without challenging the right of respondents to enter upon the premises for any legitimate purpose, plaintiffs now ask only to be admitted to the property, access to which was, in the first instance, denied them without hearing of any kind, and in disregard of the ecclesiastical law binding alike upon all the parties to the litigation, and now by decree of the circuit court. It is of this disbarment from the church property that plaintiffs complain. The temporalities of the society, not its doctrinal beliefs, are involved, according to our view of the merits of the case.

Although Yates may have expressed an indefinite desire or purpose to create in the church membership a religious enthusiasm or Christian zealousness of a high order, such as the word, "Holiness," would imply, it is not apparent whether he meant the congregation or the building itself should be so characterized. Whatever the object to be obtained or intended to be realized, certainly the mere declaration of his wish, not carried into effect or even attempted, is not sufficient, even if consummated, unless it amounted to a diversion of the property from its legitimate uses. The ultimate object of a religious organization of whatever denomination is the attainment of a high degree of Christian culture and loyalty to the cause implied in its existence as such.

Then there is this further objection. The meetings assumed the form of worship sanctioned by the denomination derisively known as "Holy Rollers," an organization noted, witnesses say, on account of its peculiar kind of services. This criticism rests in the main upon the fact that on a few occasions, near the close of the meetings conducted by him, Yates invited or permitted a minister of that denomination to occupy his pulpit and otherwise participate in his services. This act on his part, though not unusual, may have caused the excitement charged against Yates, as about that time murmurs began to be heard. If so, the permission was unfortunate, particularly so if it gave rise to the accusations limited to him alone.

However that may be, are not all these matters for the control of a majority of the church members? They only violate the rules of decorum and in no event do they disturb property or civil rights. Otherwise they become the fruitful source of interminable litigation. But if Yates erred in not exercising sound judgment or in not forbidding the degeneration of his services into a state productive of or tending to produce dissatisfaction among the church membership, that alone does not necessarily amount to a diversion of the property to the advocacy of doctrines other than those recognized by Baptists as fundamental. If his failure to exercise his pastoral authority operated in such manner as to exclude from the services by force those who otherwise adhered to Baptist doctrines and tended to deprive them of the right to enjoy the property, our duty would be plain. However, there is no evidence of such deprivation. If any number of the members of the congregation voluntarily absented themselves or abandoned their privileges and prerogatives solely because of dissatisfaction with his methods, the fault rests largely with such inaction on their part. Or if plaintiffs had done what respondents did and barred the doors against respondents, that action would have been amply sufficient to warrant the relief sought by the latter. That course was not taken. The doors of the church remained wide open for the admission of all the members until closed at the instance of respondents, without the observance of the usual preliminary procedure, thereby necessitating either resort by plaintiffs to judicial proceedings or an entire abandonment of their rights and privileges. They chose the former procedure. Can it be said that they did so unadvisedly and thereby subjected themselves to the condemnation pronounced by the decree? If so, by what authority is this procedure sanctioned?

A diligent search for such authority has proved futile and vain. Not a case examined upon this review, whose facts approach similarity to those disclosed by the record, states legal principles invokable in support of the relief granted by the decree. The *Christian Church of Sand Creek* v. *The Church of Christ of Sand Creek,* 219 Ill. 503, formerly one

organization, while interesting and instructive, states principles which are inapplicable to the facts of this case. Certain members of the original organization actually seceded, reorganized and claimed to be regular in the doctrinal beliefs and practices, and because of their alleged regularity demanded possession of the church property to the exclusion of other members. The court in paragraph 5 of the head notes is reported to have said: ''Members of a seceding faction of a congregation, who form a new organization and teach and practice innovations not recognized or taught by the original congregation, abandon their interest in the property belonging to the original congregation at the time of the division.'' In other words, there was a separation of the membership into two factions, each claiming the right to control the property to the exclusion of the other. Innovations caused the schism, as it is charged innovations sanctioned by Yates caused the division in this case. As said in *Gewin* v. *Mt. Pilgrim Baptist Church,* 166 Ala. 345: ''Courts are without power to revise ordinary acts of church discipline, or to pass on controverted rights of membership,'' when such division does not affect property rights or interest.

Between the polities of the Baptist and the Christian churches the difference is slight. Both are independent religious organizations and acknowledge no superior governing body, but each church reserves to itself the right to determine for itself its own internal affairs. Within that reservation, it seems to us, falls this, the final phase of this investigation. There is no perceivable reason or justification for the cognizance of a secular court of questions which the church itself has ample authority to determine. The exercise of the power so reserved is one of the peculiar prerogatives of Baptist organizations; and certainly there is within the membership of the First Baptist Church of Hinton a majority whose soundness of judgment, refined sense of propriety, cultivated sensibilities and religious habits of thought are sufficient to meet the emergent situation confronting it and solve its problems without invoking a secular jurisdic-

tion, when that reserved by it is amply sufficient for the purpose.

These views compel us to reverse the decree complained of, reinstate and perpetuate the injunction, remand the cause, and award costs to appellants.

*Reversed; injunction reinstated and perpetuated.*