G. BLAND BRADY, *et al., etc.,* W.VA. ANNUAL CONFERENCE OF THE UNITED METHODIST CHURCH, *et al., etc.*

*v.*

EARL REINER, *et al., etc.,* AVERY CHURCH OF MORGANTOWN

(No. 13146)

Submitted September 19, 1972.     Decided July 31, 1973.

Dissenting Opinion September 6, 1973.

14

*Wilson, Frame & Rowe, Clark B. Frame* for appellants.

*Jackson, Kelly, Holt & O'Farrell, Thomas E. Potter, Charles Q. Gage, Scott L. Messmore* for appellees.

HADEN, JUSTICE:

The subject of this appeal is an award of church property by the trial court to The United Methodist Church, represented by the appellees. The property in question is located in Union District, Monongalia County, and is generically described by the appellees as the Avery United Methodist Church of The United Methodist Church. The appellants, who are trustees of an independent church, called it simply the Avery Chapel. For purposes of neutrality it will be described in this review as the "Avery Church" and the designation is meant to include real estate, church buildings, a parsonage, all personal property found therein, and located there and elsewhere, all intangible personal

property such as bank accounts belonging to and representing additional value to the Avery Church.

The property dispute arose when the total congregation of the Avery United Methodist Church, a local church of The United Methodist Church, seceded or separated from The United Methodist Church and formed an independent church now known as the Avery Chapel. After the separation occurred The United Methodist Church, through its West Virginia Annual Conference, brought this litigation to prevent the Avery Church congregation from taking with them the property of the Avery Church to the independent church organization.

The plaintiffs and appellees in this case are the trustees of the Annual Conference of West Virginia of The United Methodist Church, which is a representative body having jurisdiction over all church activities of that denomination within the State of West Virginia with the exception of Berkeley, Jefferson and Morgan Counties. Their qualification, election and appointment was made pursuant to the ecclesiastical law of the church found in The Book of Discipline of The United Methodist Church (1968), ¶ 1519, *et seq.*, hereinafter cited as BOOK OF DISCIPLINE, U.M.C. (1968). The trustees in question are acting pursuant to the ecclesiastical law of the church specifically set forth in subparagraph 3 of ¶ 1519 which provides action that may be taken to protect church property when a dispute arises, as follows:

> "The board may intervene and take all necessary steps to safeguard and protect the interests and rights of the Annual Conference anywhere and in all matters relating to property and rights to property whether arising by gift, devise or otherwise, or where held in trust or established for the benefit of the Annual Conference or its membership."

Additional plaintiffs are D. Frederick Wertz, presiding Bishop of the West Virginia Annual Conference of The United Methodist Church, and Dr. Melvin S. Risinger, District Superintendent of the Fairmont District of the

West Virginia Annual Conference. The defendants below and the appellants are the trustees of an independent church known as the Avery Chapel Congregation who worship in the Avery Church in Monongalia County. Additional defendants are Roy E. Graham, Chairman of the Official Board of the Avery Chapel Church, and Paul M. Johnson, Pastor of that church. The appellant trustees were the former local trustees of The United Methodist Church for the local church, the Avery United Methodist Church. They had been elected, appointed and approved by The United Methodist Church through its West Virginia Annual Conference and the Charge Conference acting within the jurisdiction of the Fairmont District of the West Virginia Annual Conference. The qualification of these trustees was done in accordance with the ecclesiastical law of The United Methodist Church as set forth in the BOOK OF DISCIPLINE, U.M.C. (1968), ¶ 1528, *et seq.* Pursuant to statute, West Virginia Code, Chapter 35, Article 1, § 1, *et seq.,* (Michie's 1931), the notice of appointment of these trustees had been duly recorded in the office of the Clerk of the County Court of Monongalia County, West Virginia. Though it does not affirmatively appear of record, presumably the same individuals have now qualified and are acting as trustees of the independent church, the Avery Chapel church pursuant to statute and the rules of that church.

Each of the appellees and the appellants are also suing and being sued in their capacity as individuals. For purpose of clarity, the appellees, who generally represent The United Methodist Church through the West Virginia Annual Conference and through the Fairmont District of that conference, may be referred to in this opinion as the *general church.* The appellants acting as they were as the Avery United Methodist Church of the United Methodist Church to the date of their separation shall, when acting prior to the separation, be referred to as the *local church.* Since the date of separation the appellants have acted as representatives of the Avery Chapel

congregation and shall be referred to in that capacity as the *independent church.*

The history of the formation and operation of the general church, the local church and the independent church parallel one another in many respects and some elaboration of the interrelationship is necessary for a full understanding of the background of this property dispute.

Briefly, as to the general church, Methodism was founded in London in 1738 by John Wesley who, along with his brother Charles and others of a similar mind, formed a sect within the Church of England for purposes of direct study of church doctrine and informal participation in the reformative aspects of church organization. Shortly thereafter Methodism became known as a separate and independent denomination which quickly spread to Ireland and thence to America. In America, the church, under the principal leadership of Francis Asbury its first American Bishop, quickly grew and numbered approximately 15,000 members at the close of the American Revolution. Subsequently, the church expanded its membership significantly until 1828 when the first of its schisms or divisions occurred. At that time a group of members separated from the main church, then known as the Methodist Episcopal Church of the United States, and the separatists became known as the Methodist Protestant Church. Again in 1844, in a division which arose over the slavery issue and the increasing hostility between the citizens of the northern and southern states, a second separatist group known as the Methodist Episcopal Church South, seceded from the Methodist Episcopal Church of the United States. This separation was noteworthy in that it provided under the plan of separation for the division of church property to both the loyal and secessionists groups. In other words, by the plan of the church, the seceder, the Methodist Episcopal Church South, was permitted to take church property with it to the organization of the new church.

These three main branches of Methodism persisted until May 10, 1939, at which time they merged and reunited and became known thereafter as The Methodist Church. This church organization, The Methodist Church, continued in organization, form and government until May of 1968 when it united in merger with the Evangelical United Brethern Church to form The United Methodist Church.

As to the local church, the Avery United Methodist Church, was originally founded in the year 1843 as a local church of the Methodist Protestant Church and it was known from its inception until the year 1939 as the Avery Methodist Protestant Church. In 1939 when the Methodist Protestant Church united with the Methodist Episcopal Church and the Methodist Episcopal Church South to form the Methodist Church, the local church participated and became known as the Avery Methodist Church and continued to use that name until May of 1968. At that time it became known as the Avery United Methodist Church and adopted the usages, doctrines and ecclesiastical law of the general church as set forth in the BOOK OF DISCIPLINE, U.M.C. (1968). The congregation of the local church met in Charge Conference after the merger which formed the general church and, by an instrument dated September 30, 1968, accepted as a share of annual dues the sum of two thousand one hundred dollars payable by their congregation to the West Virginia Annual Conference of The United Methodist Church.

As an aside, we note that though the local church was known by several names within Methodism from 1843 until its separation in February 1969, its composition as a congregation was homogenous and reflected the continuity of familial relationship within its membership throughout the years. In short, the membership of this local church has always been closely related by family ties and common interest in both church and community affairs.

The relationship between the local church and the general church continued from May 1968 until February 20, 1969, although to the apparent dissatisfaction of Paul Johnson, the minister of the local church, and the local church congregation, its board chairman and trustees. The cause of the dissatisfaction became apparent on February 20, 1969, when Roy Graham, the chairman of the local church board of trustees, notified by letter Dr. Melvin Risinger, the District Superintendent of the Fairmont District of the general church, that the congregation of the local church had, by unanimous vote of those in attendance at a meeting of February 17, 1969, determined to withdraw from membership in the general church and to form an independent church to be known thereafter as the Avery Chapel. On that same date, the Reverend Paul Johnson, the local church pastor, also tendered his written resignation to Dr. Risinger and gave notice of his intention to act as pastor for the new independent church. The summarized reasons for the withdawal of the local church from the general church and the subsequent formation of an independent church were first, a difference in opinion of the theology to be taught in the local church as an affiliate of the general church, and secondly, a feeling that the local congregation had little or nothing to say in the administration of the general church and the formation of general church policies as they related to the local church. We note that which will become apparent in the subsequent discussion of this case: the reasons for withdrawal were *doctrinal* in nature, reflecting dissatisfaction with the general church theology and ecclesiastical law concerning church government.

After the notification from the local church, the district superintendent accepted the pastor's resignation and acknowledged the withdrawal of the congregation of the Avery United Methodist Church from the general church. In his return letter, the superintendent gave the minister and the congregation notice to vacate the premises known as the Avery Church on or before April 1, 1969, and

asserted the right of the West Virginia Annual Conference, acting for the general church, to its continued and retained ownership in the Avery Church property. Ignoring the claim of the general church asserted by Dr. Risinger, the congregation of the independent church has continued to use, occupy and claim ownership of the Avery Church, and the pastor, Reverend Johnson, has continued as the minister for the independent, unaffiliated religious society called the Avery Chapel.

On June 11, 1970, the West Virginia Annual Conference of the general church held its annual meeting and by resolution adopted by the body, directed the appropriate church officers to take action, legal or otherwise, to recover the property of the Avery Church as well as that of several other withdrawing congregations. Pursuant to that direction the church officers and the trustees of the annual conference instituted the action which forms the basis for this appeal.

The civil action below was commenced by representatives of the general church seeking relief under the Uniform Declaratory Judgments Act, *Code,* 1931, 55-13-1, *et seq.,* as amended. Judgment was entered against the independent church in the Circuit Court of Monongalia County upon a motion for summary judgment by the appellees. The case was tried by the court and the final order entered was based upon the pleadings, exhibits, depositions, answers to interrogatories and the affidavits in support of the motion for summary judgment. See, *Rule* 56, West Virginia Rules of Civil Procedure (1960). As a part of the relief sought by the general church, a declaration of the rights of the parties was requested. The trial court recognized church law as being applicable to the disposition of the case and entered judgment which *inter alia* provided:

> "2. The United Methodist Church is a hierarchical and connectional structured, voluntary, religious organization governed through various representative bodies called conferences each in connection with the other and operated in

accordance with rules and regulations known as *The Book of Discipline of The United Methodist Church 1968* which *Book of Discipline* constitutes the ecclesiastical law of said denomination; and which said Discipline was adopted by the supreme judicatory of said denomination called the General *Assembly* [sic] Conference.

"3. The United Methodist Church is the ecclesiastical and legal successor to the Methodist Church and its predecessors.

"4. The Avery Church, from its inception until February 17, 1969 was a local congregation connected with, a subordinate unit of and under the jurisdiction of the West Virginia Annual Conference of The United Methodist Church or its legal predecessors."

Paragraph 5. of the order constitutes an inventory of the real and personal property of the Avery Church. The order continues as follows:

"6. Defendants, constituting the congregation, officers, and trustees of the Avery Church, may not convert the aforesaid real and personal property to uses not authorized by the superior church government since the real and personal property used and controlled by said congregation was held in trust for The United Methodist Church.

"7. The defendants, constituting the congregation, trustees, and officers of the Avery Church, have the right and power to withdraw from The United Methodist Church for any reason but in so doing may not declare themselves independent and take the real and personal property held in trust for The United Methodist Church. Upon withdrawing from The United Methodist Church, the defendants forfeited their right to control and use of said property and have wrongfully and unlawfully held possession of said property since February 17, 1969.

"8. Prior to their withdrawal from The United Methodist Church the local trustees of the Avery congregation held the aforesaid property in trust for the benefit and use of The United

Methodist Church or its legal predecessors. Upon the withdrawal of the local trustees from membership in The United Methodist Church, the plaintiffs herein, comprising the Board of Trustees of the West Virginia Annual Conference of The United Methodist Church, by virtue of the aforesaid *Book of Discipline,* became the sole and rightful holders of the legal title of the above described property, real or personal, which is held by said Board of Trustees in trust for and subject to the usage and discipline of The United Methodist Church.

"9. The defendants are hereby ORDERED to immediately vacate and relinquish to the plaintiffs, possession of and control over said real property and to forthwith deliver to said plaintiffs said personal property, together with all funds and records and an accounting therefor as of February 17, 1969."

This final order was entered by the trial court on October 6, 1971. Appeal and supersedeas was granted by this Court on November 8, 1971. The case was submitted upon briefs and oral arguments on October 10, 1972.

As shown in the final order of the court below, that court applied church law to conclude that the property in question, the legal title to which was held by trustees under *Code,* 35-1-1, *et seq.,* was impressed with a trust established by church law in favor of the general church. The specific and basic provision of church law relied upon by appellees and adopted by the Circuit Court of Monongalia County is to be found in the BOOK OF DISCIPLINE, U.M.C. (1968), ¶ 1501, as follows:

"The United Methodist Church is organized as a connectional structure, and *titles to all property held* at General, Jurisdictional, Annual, or District Conference levels, or *by a local church or charge,* or by an agency or institution of the Church, *shall be held in trust for The United Methodist Church and subject to the provisions of its Discipline."* (Emphasis supplied.)

Paragraph 1503, *Id.* then provides in summary that all property acquired by the church at any level shall be acquired in conveyances containing specific trust clauses set forth in this paragraph. It also provides in subparagraph 5 thereof, ¶ 1503, *Id.*:

"However, the absence of a trust clause . . . deeds and conveyances previously executed shall in no way exclude a local church . . . from or relieve it of its connectional responsibilities to The United Methodist Church. Nor shall it absolve a local congregation . . . or Board of Trustees of its responsibility and accountability to The United Methodist Church; *provided* that the intent and desires of the founders and/or the later congregations or Boards of Trustees are shown by any or all of the following indications: (*a*) the conveyance of the property to the trustees of a local church . . . of any predecessor to The United Methodist Church; (*b*) the use of the name, customs, and polity of any predecessor to The United Methodist Church in such a way as to be thus known to the community as a part of such denomination; (c) the acceptance of the pastorate of ministers appointed by a bishop or employed by the superintendent of the District or Annual Conference of any predecessor to The United Methodist Church."

Paragraph 1504, *Id.* provides as follows:

"Nothing in the Plan of Union at any time after the union is to be construed so as to require any existing *local* church of any predecessor denomination to The United Methodist Church to alienate or in any way to change the title to property contained in its deed or deeds at the time of union, and lapse of time or usage shall not affect said title or control. Title to all property of a *local* church, or charge, or agency of the Church shall be held subject to the provisions of the Discipline, whether title to the same is taken in the name of the *local* church trustees, or charge trustees, or in the name of a corporation organized for the purpose, or otherwise." (Emphasis supplied.)

Paragraph 1506, *Id.* provides, in relation to applicable State law governing the holding of church property, as follows:

> "All provisions of the Discipline relating to property, both real and personal, and relating to the formation and operation of any corporation, and relating to mergers, are conditioned upon their being in conformity with the local laws, and in the event of conflict therewith the local laws shall prevail; *provided,* however, that this requirement shall not be construed to give the consent of The United Methodist Church to deprivation of its property without due process of law or to the regulation of its affairs by state statute where such regulation violates the constitutional guarantee of freedom of religion and separation of Church and state or violates the right of the Church to maintain connectional structure; . . . ."

Pertinent to the withdrawal of the local trustees from membership in the general church occurring in this case, ¶ 1534, *Id.*, provides as follows:

> "Should a trustee withdraw from the membership of The United Methodist Church or be excluded therefrom, his trusteeship therein shall automatically cease from the date of such withdrawal or exclusion."

Relevant to the propriety of the institution of this civil action by the West Virginia Annual Conference of the general church, ¶ 1550, *Id.*, provides:

> "1. With the consent of the presiding bishop and of a majority of the district superintendents and of the district Board of Church Location and Building of the district in which the action is contemplated, the Annual Conference may declare any local church within its bounds discontinued or abandoned. It shall be the duty of its Board of Trustees to make such disposition of the property thereof as the Annual Conference shall direct; . . .

"4. When a church property has been abandoned by its membership and no abandonment action has been taken by the Annual Conference and circumstances make immediate action necessary, the Annual Conference trustees may take control of the property, with the consent of the presiding bishop and the district Board of Church Location and Building of the district in which the property is located . . . ."

The real property of the Avery Church was acquired in four separate conveyances over the years. As the presence or absence of trust clauses specified in ¶ 1503, *Id.* governs the disposition of church property, if the lower court was correct in its application of church law, it becomes necessary to briefly recite the circumstances concerning the acquisition and improvement of church property. Relevant, also, to subparagraph 5 of ¶ 1503, *Id.* where a specific trust clause is absent from the conveyance, the background and history of the church's affiliation with The United Methodist Church or its predecessors is important. Also relevant and bearing on the issue are the ministerial appointments to the Avery Church over the years.

As to the acquisition and improvement of the Avery Church property, it appears that the present members of the independent church known as the Avery Chapel, total approximately 200 people. Wholly by their labors and contributions of funds and in kind, they and their ancestors have constructed an attractive church, the original part of which was built some one hundred twenty years ago from oak sills taken from nearby hardwood forests upon a foundation which was cut and laid from native stone. *All* improvements, and there were many over the years, have been made without direct or indirect financial aid of the general church or its predecessor organizations.

The real estate was acquired by deeds executed and recorded as required by State law. The property in question has been held by trustees as required by *Code,* 1931, 35-1-1, *et seq.*, as follows:

(a)   On April 7, 1855, Johan Vandervort of Monongalia County, West Virginia, conveyed to Peter J. Lashley, et al., in their capacity as Trustees of the Methodist Protestant Church and their successors in office, a parcel of real estate with the following provision: "To have and to hold the same to the said Trustees and their successors forever."

(b)   On December 9, 1939, the Monongalia County Board of Education conveyed to Elmer Vandervort, et al., as Trustees of the Avery Methodist Church and their successors in office, a parcel of real estate adjacent to the church property previously described.

(c)   On June 1, 1949, Wilbur R. Coombs and wife conveyed to Elmer Vandervort, et al., as Trustees for the Avery Church of the Methodist Church, "formerly the Methodist Protestant denomination, before its consolidation or union with the Methodist Episcopal Church and to their successors in office" another piece adjoining the previously mentioned conveyances. This conveyance specifically imposed the following trust upon the real estate:

> "This conveyance is made to the aforesaid Trustees . . . in trust, that said premises shall be used, kept and maintained as a place of divine worship or residence of the Methodist ministry and members of the Methodist Church; subject to the disciplinary usage and ministerial appointments of said church as from time to time is authorized and declared by the General Conference and the Annual Conference within whose bounds the said premises are situated."

(d)   On April 11, 1963, Robert E. Smyth and wife conveyed to Frank P. Donaldson, et al., and their successors as Trustees of the Avery Chapel Methodist Church, the fourth and final parcel of the real estate now under dispute in this case.

It is to be noted that only the deed set forth in (c) above conditions the holding of the property in the hands of the trustees upon an express trust in favor of a

predecessor organization to the general church. For this reason, a somewhat different disposition is called for in the application of principles of law which govern the outcome of this case.

As to name, the record clearly establishes, and it is not controverted by appellants, that the various congregations conducted their affairs under the provisions of the Book of Discipline of The United Methodist Church and predecessor organizations. The congregation held themselves out to the community at large in Monongalia County, West Virginia, as a Methodist Church during the many long years of religious continuity of the Avery Church. The sign in front of the church always proclaimed the designation of Methodist to the church property.

As to ministers, the local congregation, without contradiction apparent in the record of this case, for many years until February 20, 1969, accepted the appointment and employment of ministers made by the bishop and the district superintendent or their predecessors acting on behalf of the general church. Again, until February 20, 1969, the local congregation paid conference dues and assessments to the general church or its predecessor.

The contentions of the parties on this appeal are several.

Basically, the general church acting through the appellees contend for the correctness of the trial court decision and assert here again its right to retain the property known as the Avery Church pursuant to church law and the decision of the highest church judicatory passing on the property dispute. The general church also relies upon the United States Constitution, the West Virginia Constitution and the West Virginia statutes regarding the holding and disposition of church property, the separation of church and state, the right to freely exercise one's religion and the preclusion of State action or interference from the establishment, or to the protection or support of any organized church. The

appellees contend these constitutional and statutory provisions facilitate the application of the rule of the church which supports the lower court's decision.

The appellees argue, in the alternative, that if the West Virginia statute, *Code*, 1931, 35-1-1, *et seq.* is to be construed by this Court to achieve the result of vesting legal title in the independent church, that statute is unconstitutional.

On the other hand, the local church through the appellants persuasively claims ownership of the real and personal property known as the Avery Church by virtue of conveyances, gifts, contributions, personal labors, and continuity of ownership in themselves or their predecessors since 1843. The appellants contend as trustees they are the legal owners of the Avery Church property and are entitled by State law and specific principles of property law to carry church property with them to the formation of their own independent church known as the Avery Chapel. The independent church contends also that the ecclesiastical law of the general church found in the BOOK OF DISCIPLINE, U.M.C. (1968) is irrelevant, not applicable to this church property dispute, and should be ignored by this Court.

Before entering upon a discussion of the law of the case and a disposition on the merits, this Court notes its gratification with the excellent briefing and presentation of the case on appeal by respective counsel.

One of the appellants' primary contentions on this appeal is that the trial court was in error in disposing of the case by an award of summary judgment to the appellee. The basis of this assertion is that there remains outstanding a genuine issue or issues of fact to be resolved in trial. We hold this contention to be without merit. Recognizing that the burden is upon the movant to establish the absence of controverted ultimate facts, we believe the trial court to have been correct in its determination that there was no genuine factual dispute.

Belatedly, after the trial court ruled on the case, appellants asserted that the legal effect of the conveying instruments involved in the case presented a mixed question of law and fact. Secondly, that there may be genuine issues of fact in regard to the ownership of specific items of personal property which will become apparent only upon the elaboration which develops in a trial.

For reasons which will be set forth in the discussion of this case, appellees concede they would not be entitled to property donated under express provisions of a will or other instrument containing specific limitations contrary to ownership by the The United Methodist Church. If such be the fact upon discovery of a conditional conveyance of property, a supplemental legal proceeding may be necessary for determination of title.

We have studied the authories urged upon us by the appellants in regard to the assertion that the deeds present mixed questions of law and facts and find them not to be persuasive. In absence of a factual dispute to resolve differences in the words describing the property conveyed in the deed with the actual amount of land as determined by a view, survey, description of contiguous property or like extrinsic evidence, the construction of a deed is wholly a question of law for the court. *Davis Colliery Co. v. Westfall,* 78 W.Va. 735, 90 S.E. 328 (1916); *Mylius v. Raine-Andrew Lumber Co.,* 69 W.Va. 346, 71 S.E. 404 (1911). In that the parties to this case did not dispute the quantity or extent of real property, but rather the ultimate title to that which is described in the deeds, we find no reason for the empaneling of a jury.

In any event appellants' assertion of disputed facts preventing summary judgment is more problematical than real. The lower court and this Court on review cannot conjure "if and maybes" into controverted facts when they are not presented in opposition to a motion for summary judgment. The record in this case is bereft of opposition affidavits or other means of expressing

factual controversy to appellees' motion for summary judgment. Rule 56 (c), W.Va. R.C.P. provides for a speedy determination of legal issues when the developed record discloses no genuine issue of material fact. Consonant with the spirit of the rule, this Court has previously held, upon ample supporting authority, that to successfully resist a motion for summary judgment, the party against whom it is made must present some evidence to indicate to the court that facts are in dispute, when the moving party's evidence shows no disputed facts. The mere contention that issues are disputable is not sufficient to deter the trial court from the award of summary judgment. *Petros v. Kellas,* 146 W.Va. 619, 122 S.E.2d 177 (1961). There is no disputed factual matter presented to this Court by appellants which prevents a disposition of the case by application of the rules of law. No further development is believed by us to be necessary to accomplish a resolution of the legal questions presented.

The basic question presented by this appeal is whether a local parish or affiliate of The United Methodist Church has a right to withdraw from that church and take with it to the formation of an independent church such property, real and personal, accumulated, controlled and used by the local church over the years? A secondary question is which body of law—church or state—controls the determination of property ownership? Also, does a civil court have jurisdiction to determine a question of church law or may it merely apply and enforce the ecclesiastical ruling? May a civil court determine for itself questions of church doctrine involving polity, ecclesiastical law and property ownership, or must a civil court abstain entirely from doctrinal questions in arriving at a decision?

To approach the many and complex problems presented by this case, it is necessary to survey the relationship of church and state in regard to property disputes from an historical standpoint. The story begins in England.

Unlike the United States of America, England recognized and supported an established state church, the Church of England. Though the Church of England was itself an outgrowth of the reformation process on the Catholic Church, with more than incidental aid from Henry the Eighth, it soon became established with the same dignity, weight and autocracy of the Church from which it separated. Later movements of the Protestant reformation thrust placed serious stress on the monolithic structure of the Anglican Church. What first appeared as mere schisms and off-shoot associational groups within the established church soon became separate and independent churches. Those who had once been Trinitarians became Unitarians. Those which had been structured connectional churches with the Church of England became congregational churches independent of any united church structure, and those who called themselves Anglicans became Methodists, Episcopalians, and the like. Naturally, when the churches non-affiliated with the state church and separated themselves into independent churches, disputes as to ownership of property arose. The English courts were plagued with such disputes and the logical resolution of them until the decision of two cases in the early nineteenth century.

In the cases of *Attorney General v. Pearson*, 3 Mer. 353, 36 Eng. Rep. 135 (Ch. 1817) and *Craigdallie v. Aikman*, 3 Eng. Rep. 601 (H.L. 1813), Lord Eldon, the Chancellor, established a rule governing the disposition of church property where a schism occurred resulting from intrachurch disputes. According to the rule variously designated as "Lord Eldon's Rule" or the "implied trust—departure from doctrine rule," property contributed to a religious body by its members over the years was to be impressed by court rule with a trust in favor of the fundamental doctrines and usages of the organization at the time the contributions were made, and in a dispute concerning the control of the property, coupled with the assertion of departure from doctrines and usages of the church, civil courts should award the control to the group

faithful to the original trust. In other words, Lord Eldon determined that church property was held in trust for the propagation of a particular religious doctrine of usage, and that it was the duty of the court when called upon to resolve disputes relating to control and possession of church property, to award the property to the faction which adhered to the original tenets of faith. In the Chancellor's opinion doctrinal continuity was the most essential characteristic of a church. Conversely, doctrinal innovation was tantamount to the repudiation of an implied contract which bound the members of a church to adhere to the original tenets of the faith. This legal theory was constructed on the foundation of the charitable trust doctrine which had previously recognized that an express trust for a religious purpose would enjoy the protection that had come to be accorded to charitable trusts generally. Such trusts were recognized and enforced by the civil courts by authorization of the Statute of Charitable Uses. 43 Elizab. c.4. But the unique feature of Lord Eldon's opinion was the judicial declaration that contributions and gifts to a church not expressly earmarked as a trust in favor of established doctrines and usages were, by judicial fiat, impressed with an implied trust and the purposes of the trust were to be ascertained by a determination of the court of the basic doctrines of the church as it was at the time the gift or contribution was made. This rule not only invited, it commanded inquiry by the civil court as to what constituted the basic beliefs of a group of persons who had banded together into a voluntary association for the purposes of worshiping their idea of a Supreme Being and of governing themselves in their mutual relation with one another and their diety. The court was necessarily required to identify and appraise both the fundamental doctrines and the substantiality of the alleged departures from it in order to determine which faction within a divided congregation was entitled to control the church property.

The rationale for that rule appeared to be based upon the state's bias to support and protect established churches.

On the other hand, the framers of the Bill of Rights of the United States Constitution, entered upon their labors with a firm conviction that each man was free to worship as he pleased and that no church or churches should receive the support, establishment and protection of the state. That this principle was primary in the minds of our founding fathers is readily apparent from the fact that they set it forth in the First Amendment to the United States Constitution. Thought and the declaration of basic principles, however, were not necessarily translated into the deed.

Many states in apparent disregard of the First Amendment, accepted Lord Eldon's rule as a part of their common law. Though the New England states developed a body of law permitting the independence of individual worship and the autonomy of congregational churches, the Mid-Atlantic and Southern states, on the other hand, provided fertile soil for many new sects and faiths and the courts there experienced the church litigation which had plagued their English predecessors. See generally, ZOLLMAN, AMERICAN CHURCH LAW (1933); Casad, "The Establishment Clause and the Ecumenical Movement," 62 Mich. L. Rev. 419 (1964); Stringfellow, "Law, Polity, and the Reunion of the Church: The Emerging Conflict Between Law and Theology in America", 20 Ohio St. L.J. 412 (1959); Note, "Judicial Intervention in Disputes Over the Use of Church Property," 75 Harv. L. Rev. 1142 (1962). Baptists and Free-Will Baptists, Brethern and Dunkards, Episcopalians and Methodists, and many others split and resplit and reformed themselves into various churches. Many times, property disputes arose which were carried to the courts. The courts in these states seemed to adopt or ignore Lord Eldon's rule as the facts of the particular dispute dictated. Equity ascendant; constitutional principles be damned. Sometimes the

"established church" was favored by the court's decision; at other times, the off-shoot faction of the church prevailed. No logical thread of consistency developed to govern the outcome of these disputes or to·portend the future direction of the law. *Trustees of Organ Meeting House v. Seaford,* 13 N.C. (II Dev. Eq.) 453 (1830); *Presbyterian Congregation v. Johnston,* 1 Watts & S. 9 (Pa. 1841); *Miller v. Gable,* 2 Denio 492 (N.Y. 1845); *Vasconcellos v. Ferraria,* 27 Ill. 237 (1861); *Hale v. Everett,* 53 N.H. 9, 16 Am. Rep. 82 (1868).

But if there was value in these early decisions, it was manifested in a recognition by the courts that not all churches governed themselves or their members alike. Some churches held themselves independent of any other body, while other church organizations were tightly structured and connected in governmental alliance much like the Federal Republic of the United States. Other churches, though in apparent alliance or affiliation with those who held similar beliefs at different locations, still retained local control to a degree that they remained autonomous to any larger governing body. If an analogy to civil government is appropriate, it could be said these latter church organizations governed themselves much as the states did under the Articles of Confederation which governed this country from Independence until the adoption of the United States Constitution in 1789. Recognizing these different forms of church government, the courts were urged by the churches concerned to apply different rules when dissimilar organizations or polities were involved.

Polity refers to the general governmental structure of a church, the organs of authority and the allocation and· locus of its judicatory powers as defined by its own organic law. Two broad types of church polity are recognized by the courts: (1) the hierarchical and (2) the congregational. See generally, Note, 75 Harv. L. Rev. 1142, 1143-44 (1962), *supra.*

In the hierarchical type of church the local congregation is an organic part of a larger church body and is subject to its laws, procedures, and organs according to an ascending order of authority. It does not enjoy local autonomy. Its doctrine is defined by that of the parent body and its property, while peculiarly a matter of local enjoyment, is held for uses consistent with the written rules, doctrines and practices of the denominational parent church. A further distinction may be made between two types of polities within the general hierarchical group of churches, namely, (a) the episcopal polity and (b) synodical, or associational polity. In churches with the episcopal polity—of which the Roman Catholic and Episcopal churches are good examples—authority is vested at various defined levels in ecclesiastical officers, and the general system may be described as authoritarian in character. In churches with a synodical or associational polity, authority is delegated to elected organs exercising power at various levels and culminating at the pinnacle with an elected representative body which constitutes the highest organ of authority. This polity has a democratic base. See, 66 AM. JUR. 2d *Religious Societies* § 53 (1973). The Presbyterian Church affords the most often cited example of the synodical polity. In The United Methodist Church, this form of hierarchical polity is designated as "connectional." BOOK OF DISCIPLINE, U.M.C. (1968) ¶ 1501.

The congregational polity, by contrast to the hierarchical, features local congregational autonomy as its central characteristic. It is premised on the idea that the local congregation is the highest authority in all matters of doctrine and usage. Indeed, congregationalism is in itself a fundamental principle of these churches. The Congregational Church and the Baptist Church are prime examples of churches with a congregational polity. It does not follow, however, that a church with a congregational polity may not be affiliated with a national church body or denomination in order to achieve some purposes

in common with other congregations of a like nature. What is distinctive to a church of congregational polity is its freedom to join or to withdraw from such a body, its freedom from control of any ecclesiastical law (other than its own) or authority of a larger body, and its freedom to act according to the will of a majority of its members, subject only to the rules and limitations prescribed by the internal law of its own constitution and bylaws. See generally, 76 C.J.S. *Religious Societies* § 2 (1952).

The usefulness to courts of the distinction between hierarchical and congregational polities in resolving the church property issues by reference to the implied trust doctrine is readily apparent. The hierarchical church is less often vulnerable to judicial intrusion by virtue of the fact that it has its own general law, procedure, and organs for the authoritative resolution of internal disputes. Moreover, it gives some assurance of the continued institutional stability that may be ascribed as the end object of the implied trust doctrine. On the other hand, in the case of a church with a congregational polity, with the result that the local congregation is autonomous and subject to majority rule, the danger of manipulation by a shifting and impermanent temporal majority so as to hasten deviations from established doctrine and usage is greater and consequently invites more frequent and intrusive judicial scrutiny. For example, see *Bouldin v. Alexander,* 15 Wall. 131, 21 L. Ed. 69 (1872); *Canterbury v. Canterbury,* 143 W.Va. 165, 100 S.E.2d 565 (1957); *Woodrum v. Burton,* 88 W.Va. 322, 107 S.E. 102 (1921); *Smith v. Pedigo,* 145 Ind. 361, 33 N.E. 777, *pet. for reh. den.,* 145 Ind. 361, 44 N.E. 363 (1896); *Mt. Zion Baptist Church v. Whitmore,* 83 Iowa 138, 49 N.W. 81 (1891).

This was the general posture of court relationship with the churches when in 1871, the United States Supreme Court took its first plunge into the rolling waters of contradictory court decisions involving church property disputes.

The landmark decision of *Watson v. Jones,* 13 Wall. 679 (1871), established some basic rules, defined various types of church property disputes, and recognized and classified types of church government consistent with the immediately previous discussion of polity. In *Watson,* the specific issue submitted to the court was which of two factions of the Walnut Street Presbyterian Church of Louisville, Kentucky, was the true owner of church property. There a schism in church membership had occurred because of the slavery issue. Specifically, those who were apparent loyalists to the Union and abolitionists on the slavery issue established a rule subsequent to the Civil War that those who had aided in the "rebellion" or who believed that slavery was a divine institution should be required to repent of their sins before they could be received back into the fold of church membership. In an effort to resolve the controversy the highest governmental organ of the Presbyterian Church, the General Assembly, declared the loyal faction to be the "true" Walnut Street Church. When the division persisted, the loyal group sought injunctive relief to assure its control over congregational property. The opposition group's argument was that the General Assembly's declaration respecting the slavery issue had exceeded its authority, since the constitution of the Presbyterian Church prohibited it from "meddling in civil affairs" and, consequently, the Assembly's power to "decide controversies" and to "suppress schismatical disputes" had not been exercised within the limits of its judicatory authority.

The "non-loyal" faction had obtained relief in the state court of Kentucky. *Avery v. Watson,* 2 Bush 363, 65 Ky. 332 (1868). Subsequently, however, the "loyal" faction found a diversity question and began litigation anew in the federal courts. The Court, speaking through Mr. Justice Miller, held for the loyal faction.

In *Watson,* Justice Miller also classified cases in which courts were asked to resolve disputes over church property into three basic catagories.

First, the Court recognized cases where the dispute arose over property received by a religious institution conditioned upon the express terms of the granting instrument limiting the use and disposition of the property to the teaching, support and spread of some specific form of religious doctrine or belief. In this type of case the deed or conveying instrument expressly conditioned the use of the property.

Secondly, it recognized cases where the property is held by a church of congregational or independent polity which "owes no fealty or obligation to any higher authority." *Id.,* 722.

Third, the Court recognized cases where the ecclesiastical body holding or controlling the property was "a subordinate member of some general church organization in which there are superior ecclesiastical tribunals with a general and ultimate power of control more or less complete in some supreme judicatory over the whole membership of that general organization." *Id.,* 722-3.

As for those cases falling into the first class: where the instrument of conveyance contained an expressed trust, the ordinary principles of charitable uses would apply. The rule would be that neither the majority of the congregation in an independent church nor the higher authority in the hierarchical church could direct the property uses to which it had not been dedicated.

In the second type, where the properties have been acquired by an independent or congregational church, and no specific tenet is attached to it, where there is a schism which leads to a separation into distinct and conflicting bodies, the rights of such bodies to the use of the property must be determined by the ordinary principles which govern voluntary associations. Here the internal law of the congregation was to be determinative. If its own rule is that the majority vote determines the manner of using the property, this determination was to be accepted as final by the individual members and by the courts.

In the third class of cases—the one actually involved in the *Watson* case—where the congregation is a member of a church with a hierarchical polity, the Court said at page 727:

> "In this class of cases we think the rule of action which should govern the civil courts, founded in a broad and sound view of the relations of church and state under our system of laws, . . . is, that, whenever the questions of discipline or of faith, or ecclesiastical rule, custom or law have been decided by the highest of these church judicatories to which the matter has been carried, the legal tribunals must accept such decisions as final, and as binding on them, in their application to the case before them."

One of the most significant aspects of the opinion was its specific repudiation of Lord Eldon's departure-from-doctrine standard and the correlative implied trust rule. Substituted in place of the English rule, the Court impliedly recognized the strictures of the First Amendment and held:

> "In . . . cases where the right of property in the civil court is dependent on the question of doctrine, discipline, ecclesiastical law, rule, or custom, or church government, and that has been decided by the highest tribunal within the organization to which it has been carried, the civil court will accept that decision as conclusive, and be governed by it in its application to the case before it." Syllabus Point 10 *Id.* at 680.

At the following term in the case of *Bouldin v. Alexander,* 15 Wall. 131, 21 L.Ed. 69 (1872), the Court applied the *Watson* rules to a church of a congregational polity. The holding, consistent with the rule that church law should be recognized by the civil courts, was that trustees of a Baptist church in the District of Columbia could not be removed by a minority of the church society in direct contravention of church rules.

The Supreme Court had no further occasion to deal with church law until the case of *Gonzalez v. Archbishop*

*of Manila,* 280 U.S. 1 (1929), when it reviewed and affirmed a decision of the Philippine Supreme Court which had dismissed a complaint challenging the refusal of the Roman Catholic Archbishop of Manila to appoint petitioner as a chaplain on the ground that he did not satisfy the qualifications established by a canon law for that office. Respecting the role of a civil court in the case of a dispute over an ecclesiastical matter, the Court, speaking through Mr. Justice Brandeis, said:

> "In the absence of fraud, collusion, or arbitrariness, the decisions of the proper Church tribunals on matters purely ecclesiastical, although affecting civil rights, are accepted in litigation before the secular courts as conclusive, because the parties in interest made them so by contract or otherwise." *Id.* at 16.

With these words, the Court, without elaboration, qualified the *Watson* rule of judicial abstention from doctrinal inquiry by indicating that the presence of fraud, collusion or arbitrariness could invite judicial inquiry into matters otherwise purely ecclesiastical. According to one commentator, see ZOLLMAN, AMERICAN CHURCH LAW, Section 318 (1933), this exception was constructed to make certain that the churches follow their own rules, and to give access to the courts to enforce rights declared under church law.

Another significant indication of the *Gonzalez* case was that the reason for the *Watson* rule recognizing that church law is conclusive upon civil courts, was that the parties in interest agreed to that approach by contract or otherwise. The implication being that the Supreme Court recognized the conclusiveness of ecclesiastical decisions in hierarchical and congregational church governments because of the implied consent, compact or contract of the church members to abide by church rules as a condition of enjoying church membership. This point is succinctly illustrated by Mr. Justice Miller in *Watson,* 13 Wall. at 729, *supra*: "All who unite themselves to such a body do so with an implied consent to this

government, and are bound to submit to it." Thus, the Court in rejecting the implied consent—departure-from-doctrine approach, substitutes an implied contract or an implied consent to be governed in order to support the trust which provides a vehicle for the beneficial ownership in the church property held by trustees for it.

Returning to general discussion of the *Watson, Bouldin* and *Gonzalez* cases, and their impact, if any, upon the decisions of state courts, it must be noted that these decisions as to substantive matters regarding the separation of church and state formed a part of the federal common law under the doctrine of *Swift v. Tyson,* 16 Peters 1 (1842), but were not dispositive as to state issues on the same subject. After the decisions of *Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 58 S. Ct. 817, 82 L. Ed. 1188 (1938) and *Ruhlin v. New York Life Insurance Co.,* 304 U.S. 202, 58 S. Ct. 860, 82 L. Ed. 1290 (1938), the rules of *Watson* and *Gonzalez* were at best persuasive though not controlling upon the state courts.

It was not until the United States Supreme Court made the Free Exercise of Religion and Establishment Clauses of the First Amendment applicable to the states under the Fourteenth Amendment that the states were invited to acknowledge the rules of *Watson* and *Gonzalez.* See *Cantwell v. Connecticut,* 310 U.S. 296 (1940) where the Court specifically held that any form of interference with religion by a state was a denial of religious liberty protected by the First Amendment as applied to the states by the Fourteenth Amendment. In *Everson v. Board of Education,* 330 U.S. 1 (1947), the Court applied the Establishment Clause to a state and held it to mean ". . . at least this: Neither a state nor the Federal Government can set up a church. Neither can pass laws which aid one religion, aid all religions, or prefer one religion over another." *Id.* at 15.

Then in 1952 the Supreme Court applied the doctrines of *Watson* and *Gonzalez* directly to a situation involving state interference with church law.

The case of *Kedroff v. St. Nicholas Cathedral of the Russian Orthodox Church in North America,* 344 U.S. 94 (1952), arose because of a dispute between the Moscow-based General Russian Orthodox Church and the Russian Orthodox Churches located in North America over an appointment to St. Nicholas Cathedral in New York City. The state had enacted a statute specifically recognizing the autonomy and separate authority of the North American churches which had declared their independence from the general church in Moscow. The New York courts sustained the validity of the statute and held that the North American Church's appointed hierarchy had the right to use the disputed cathedral. The Supreme Court reversed, holding that the statute was an unconstitutional invasion by the legislature into the government and control of the church and constituted an interference with the free exercise of religion guaranteed by the First Amendment. The *Kedroff* Court thus began the process of converting the common-law rule of *Watson* into a constitutional limitation upon state action:

> "The opinion [of *Watson v. Jones*] radiates ... a spirit of freedom for religious organizations, an independence from secular control or manipulations, in short, power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine. Freedom to select the clergy, where no improper methods of choice are proven, we think, must now be said to have federal constitutional protection as a part of the free exercise of religion against state interference." *Id.* at 116.

Addressing itself to the unconstitutionality of the particular New York statute, the Court said:

> "By fiat it displaces . . . [and] . . . passes the control of matters strictly ecclesiastical from one church authority to another. It thus intrudes for the benefit of one segment of a church the power of the state into the forbidden area of religious freedom contrary to the principles of the First Amendment." *Id.* at 119.

Some years later the New York courts attempted to achieve the same results, without the aid of the statute that the Court held invalid, but the Supreme Court reached the same result. See, *Kreshik v. St. Nicholas Cathedral of the Russian Orthodox Church of North America,* 363 U.S. 190 (1960).

The Court held it did not matter whether the state governmental invasion was by the legislature or the judiciary, the effect was the same. It was "still an application of state power" deciding religious questions prohibited by the First and Fourteenth Amendments.

The implications of these decisions seemed quite clear, yet state courts continued to apply the departure-from-doctrine standard contrary to church law and, consequently interfered with internal rulings of churches in property disputes and other ecclesiastical matters. See, for example, *Canterbury v. Canterbury,* 143 W.Va. 165, 100 S.E.2d 565 (1957); *Cantrell v. Anderson,* 390 S.W.2d 176 (Ky. 1965); *Holiman v. Dovers,* 236 Ark. 211, 366 S.W.2d 197 (1963); *Volger v. Primitive Baptist Church,* 415 S.W.2d 72 (Ky. 1967); and *Huber v. Thorn,* 189 Kan. 631, 371 P.2d 143 (1963).

In the *Canterbury* case, *supra,* this Court indicated its willingness to intrude upon the protected area of church doctrine:

> " 'Where one of two church factions excludes the other from the church property on the ground of departure from the doctrinal beliefs of the organization, for the advancement of which beliefs a trust was impressed, expressly or impliedly, by the deed originally conveying the property for church purposes, the departure, to warrant the exclusion, must be vital and substantial. Refined doctrinal distinctions are not sufficient for that purpose.' " Syllabus Point 2, *supra,* at 166; Accord, Syllabus Point 4, *Canterbury, Id.* and *Woodrum v. Burton,* 88 W.Va. 322, 107 S.E. 102 (1921).

Finally in 1969, the Supreme Court in *Presbyterian Church v. Hull Memorial Presbyterian Church,* 393 U.S. 440, explicitly held that a civil court could not base a decision as to the ownership of property which was the subject of an intrachurch property dispute on an interpretation of church doctrine.

In *Hull,* the controversy arose between the general church, The Presbyterian Church in the United States, and two local churches located in Savannah, Georgia—Mary Elizabeth Blue Hull Presbyterian Church and Eastern Heights Presbyterian Church—over the right of ownership to properties occupied by the local churches prior to the dispute. The general church established a commission for conciliation to hear the dispute. Unsurprisingly, it awarded the contested property to the general church. Rather than appeal the decision of the conciliation commission to a higher judicatory, as the church laws provided, the local churches filed suit in a Georgia civil court asking that the general church be enjoined from trespassing on their property. The local churches claimed that title to the property was in them. The general church asked that the case be dismissed and that it be granted injunctive relief. Utilizing the "implied trust" rule, the Georgia court held that although the property was held in trust for the general church, such trust was a conditional one. The condition divined by that court was: that so long as the general church adhered to the doctrines and practices in effect at the time of the local churches' affiliation, the general church ecclesiastical rule would prevail. The question was submitted to a jury which found the general church to have departed from its original tenets and doctrines. Based upon the jury's finding, the court awarded the property to the local churches. The Supreme Court of Georgia affirmed.

Upon appeal to the United States Supreme Court, the case was reversed and remanded. The sole issue determinative of the case was:

"[W]hether the restraints of the First Amendment, as applied to the States through the Fourteenth Amendment, permit a civil court to award church property on the basis of the interpretation and significance the civil court assigns to aspects of church doctrine." *Id.* at 441.

In answer to this question the Court stated:

"The Georgia courts have violated the command of the First Amendment. The departure-from-doctrine element of the implied trust theory which they applied requires the civil judiciary to determine whether actions of the general church constitute such a 'substantial departure' from the tenets of faith and practice existing at the time of the local churches' affiliation that the trust in favor of the general church must be declared to have terminated. . . . A civil court can make this determination only after assessing the relative significance to the religion of the tenets from which departure was found. Thus, *the departure-from-doctrine element of the Georgia implied trust theory requires the civil court to determine matters at the very core of a religion—the interpretation of particular church doctrines and the importance of those doctrines to the religion. Plainly, the First Amendment forbids civil courts from playing such a role."* (Emphasis added.)

The Court also injected a new element into church law when it suggested that civil courts' role in resolving property disputes should be limited to the application of *neutral principles of law* to avoid "establishing" churches. *Supra,* at 449.

Though the Court in *Hull* was definite and thorough in discrediting a state court's attempt to apply the departure-from-doctrine standard (or any standard involving inquiry into doctrine) in testing a church adjudication, and though the Court made it clear that civil tribunals have jurisdiction to enforce decisions made by church ruling bodies, it did not elaborate upon its direction that civil courts could employ the use of

neutral principles of law to resolve intra-church property disputes.

Elaboration came later. In 1970 in the case of *Maryland and Virginia Eldership of the Churches of God v. Church of God at Sharpsburg, Inc.,* 396 U.S. 367, the Court in a *per curiam,* affirmed the Maryland Court and approved of its resolution of a church property dispute, on the basis that it involved no inquiry into religious doctrine, proscribed by *Hull,* and consequently raised no federal question. Mr. Justice Brennan, who wrote the majority decision in *Hull,* took this opportunity to expand on the principles of *Hull* in a concurring opinion in which Mr. Justice Douglas and Mr. Justice Marshall joined.

In this concurrence, Justice Brennan set forth three permissible constitutional approaches to resolution of church property disputes. The thrust of his opinion was that these principles, or others not listed, could be employed singly or in combination to resolve the dispute without infringing on First Amendment freedoms.

First, he suggested that the *rule of the church,* whether its polity be congregational or hierarchical, could be applied and enforced by the Court. This was essentially an affirmation of the *Watson* decision. As to the *polity* characteristics of the particular church, he opined, where the identity of the governing church body and polity is known and settled, identification merely by the Court is proper. Conversely, the *Hull* ruling would prohibit inquiry by the Court into religious law and usage to determine identity where identification remains a matter of substantial controversy within the church. As to the *locus of authority* or allocation of power within a church, he said where the question whether the relevant church governing body has power over religious law to control the property disputed is known and settled, the identification by civil courts of the judicatory or discipline within the church structure is permissible. Again, *Hull* would prohibit inquiry where the locus of

power is itself a matter of substantial controversy within the church.

The only exceptions which Justice Brennan recognized to the application of the rule of the church were two in number: First, the rule of the church does not apply where the express terms in the instrument by which the property was acquired condition the property's use or control in a specified manner contrary to the rule of the church. But again, *Hull* would prevent the enforcement of the express terms of a conveying instrument where the instrument requires a court to determine the controversy on religious doctrine and practice. Secondly, Justice Brennan reaffirmed the *general* and overriding limitation to the rule of the church, previously expressed by Justice Brandeis in *Gonzalez, supra*: civil tribunals may narrowly examine church rulings alleged to be the product of fraud, collusion or arbitrariness.

The second constitutionally permissible manner of resolving church property disputes would be through the application of neutral principles of property law. He said under the "formal title" doctrine, civil courts may determine ownership by reference to deeds, reverter clauses and general state corporate laws. But, if the application of neutral principles involves, in any manner, a requirement that the courts assess church doctrine or find a departure from doctrine, such could not be civilly enforced consistent with *Hull*. It would appear to this Court that the application of neutral principles of law could dovetail into the rule regarding the express conditions in the conveying instrument.

The third permissible constitutional approach suggested by the Justice was that state legislatures, with a recognition of the thrust of *Hull* and *Watson,* could enact special statutes governing church property arrangements in a manner precluding state interference in doctrine or state establishment of a church. Although no case has been found which indicates a resolution of a church property dispute based directly on actions done pursuant

to state statute, footnoted citations in *Sharpsburg* refer one to examples of the proscribed state legislative intervention in church matters. *Kedroff, supra; Northside Bible Church v. Goodson,* 387 F.2d 534 (5th Cir. 1967).

In *Goodson,* the court held unconstitutional an Alabama statute that authorized a 65% majority of the local congregation to sever its connection with the parent church and to retain possession and ownership of its local church property free and clear of any trust in favor of the parent church whenever the local group determined that a change of social policies had occurred within the parent church. The court said that the statute ". . . brazenly intrudes upon this very basic and traditional practice of The Methodist Church, and supersedes the processes available within the church structure for the settlement of disputes." *Id.,* at 538.

Where applicable to the facts at hand, our decision in respect to the Avery Church property must tread the pathway paved for the states by the Supreme Court in the *Watson, Gonzalez, Cantwell, Everson, Kedroff, Kreshik* and *Hull* cases, *supra.* This Court also recognizes and adopts, as its own, the constitutionally permissible methods of resolving these property disputes as suggested by Mr. Justice Brennan, in his illuminating concurrence in the *Sharpsburg* case. We intend to apply these principles to test the validity of this decision, recognizing as did Mr. Justice Brennan the methods suggested there are not exhaustive of the possibilities of valid state enforcement of church decisions in property disputes.

Should one, however, gain the impression that our decision will be fashioned wholly from federal direction, we hasten to affirm that the West Virginia constitutional provisions insuring religious freedom reflect an allegiance to principles of religious freedom antedating the First Amendment.

Article III, Section 15 of the West Virginia Constitution provides:

"No man shall be compelled to frequent or support any religious worship, place or ministry whatsoever; nor shall any man be enforced, restrained, molested or burthened, in his body or goods, or otherwise suffer, on account of his religious opinions or belief, but all men shall be free to profess, and by argument, to maintain their opinions in matters of religion; and the same shall, in no wise, affect, diminish or enlarge their civil capacities; and the legislature shall not prescribe any religious test whatever, or confer any peculiar privileges or advantages on any sect or denomination, or pass any law requiring or authorizing any religious society, or the people of any district within this State, to levy on themselves, or others, any tax for the erection or repair of any house for public worship, or for the support of any church or ministry, but it shall be left free for every person to select his religious instructor, and to make for his support, such private contract as he shall please."

This Court proudly recognizes the language of this section of the West Virginia Constitution which was transcribed almost verbatim from the Virginia Statute of Religious Freedom enacted in 1785 and authored by Thomas Jefferson. That statute was the genesis for the drafting of the First Amendment to the United States Constitution. See, *Bond v. Bond,* 144 W.Va. 478, 109 S.E.2d 16 (1959) wherein it was said at page 492:

"Perhaps no single individual has made a greater contribution to the cause of religious liberty in the United States than the immortal Thomas Jefferson. He proudly proclaimed his authorship of the Virginia Statute of Religious Freedom, which was enacted in 1785 and which has formed a part of the Virginia Code to this date. It is said to have formed a model for statutes and constitutional provisions throughout the land. 4 W. & L. Law Rev. 35; 12 Va. Law Rev. 632; *Jones v. Commonwealth,* 185 Va. 335, 38 S.E.2d 444."

Accord, *Hughes v. Board of Education,* 154 W.Va. 107, 174 S.E.2d 711 (1970). As recognized by Mr. Justice Berry in

the recent decision of *State v. Everly*, 150 W.Va. 423, 146 S.E.2d 705 (1966) in drawing a comparison between the West Virginia provisions on religious freedom and the First Amendment to the United States Constitution, and speaking for the entire Court said, at page 425 of the West Virginia Report: "The provision of the West Virginia Constitution . . . is much broader [than the First Amendment to the United States Constitution] . . . ." By its specification of the rights incident to the free exercise of religion and the prohibition of the establishment of any church or religious belief to the detriment of another, it is even more stringently protective than the corresponding federal provision.

If the West Virginia constitutional provision providing for religious freedom was not sufficient in itself to reflect the intent of the founders of this State, Article VI, Section 47 of the Constitution gives further emphasis that this State will not give aid to the establishment of church organizations:

> "No charter of incorporation shall be granted to any church or religious denomination. Provisions may be made by general laws for securing the title to church property, and for the sale and transfer thereof, so that it shall be held, used, or transferred for the purposes of such church, or religious denomination."

See also, *Code* 1931, 31-1-4, as amended; accord, *Lunsford & Withrow & Co. v. Wren*, 64 W.Va. 458, 63 S.E. 308 (1908).

Any discussion of West Virginia law involving a church property dispute must begin with a recognition that the above article prohibiting the incorporation of religious organizations carries with it the delegation to the Legislature to provide, by law, the method of ownership of church property. West Virginia Code, Chapter 35, Article 1, Section 1, *et seq.*, as amended, (Michie's 1931) provides methods whereby property of religious organizations may be held, controlled, conveyed, mortgaged, or otherwise disposed of. This article of the

Code is of singular importance to the disposition of this case. First, all property which is the subject of this appeal is held in accordance with the provisions of the statute, and secondly, the appellants rely upon an interpretation of this statute to sustain their right to carry the Avery Church property with them to the organization of the new church.

Specifically, the appellants assert that this article of the *Code* and the decisions of this Court in *Deepwater Railway Company v. Honaker,* 66 W.Va. 136, 66 S.E. 104 (1909) and *Carskadon v. Torreyson,* 17 W.Va. 43 (1880) support the proposition that deeds conveying land to trustees of a local church shall be construed to mean that the local church is the owner of real estate, and in this case, personal property as well, to the exclusion of the general church organization even though the church organization to which that local church may have been affiliated is hierarchical in form and polity, prescribes in its ecclesiastical law that all property is to be held for the benefit of the parent church organization. Summarized, the statute in question, according to the appellants, permits religious organizations to hold property, but in the event of a dispute, the legal title and the right to control and dispose of property is vested in the individual local church exclusively, without regard to the polity of the church involved as defined by its ecclesiastical laws.

Consequently, we must review the statute to determine if a proper construction supports the proposition advanced by the appellants.

Chapter 35, Article 1 provides that every *conveyance,* devise or dedication *of land* of less than four acres in a municipality or sixty acres in unincorporated areas within the State, ". . . *for the use and benefit of any church,* religious sect, society or denomination . . .", for several all-inclusive religious purposes specified in the statute, ". . . *shall be valid,*" and *"shall be construed to give the local* parish, *congregation* or branch *of such church,*

religious sect, society or denomination, *to which any such land or property has been or shall be so conveyed . . .,* the *control thereof,* unless from the intent expressed in the conveyance . . ., some other or larger body be given such *control."* (Emphasis supplied.)

In a dispute with a former grantor to church property, the *Deepwater Railway* case, *supra,* construed the meaning of this section to give the local church control of the property upon objection of the former owner in a condemnation proceeding involving part of the property. This case and the *Carskadon v. Torreyson* case, *supra,* stand for the proposition that a conveyance of property to trustees for religious purposes will not be held void for uncertainty as to objects and purposes of religious trusts, and will be enforced as valid if made pursuant to statute. Control, however, is not equivalent to beneficial ownership and neither of these cases passed upon the question which is before this Court at this time.

Section 3 of the statute provides that, notwithstanding the provisions of Section 1 which establish control in the local church, ". . . *no* lot of ground or *property now used for religious purposes shall be taken from the members of the church,* religious sect, society, *or denomination, or of the individual church. . ., that has heretofore purchased the same or for whose use or benefit it was heretofore conveyed, devised or dedicated."* (Emphasis supplied.) We hold a proper interpretation of Sections 1 and 3 of the statute does not permit the "local control" provision of Section 1 to abrogate rights of beneficial ownership in church property.

One of the underlying reasons for the enactment of Chapter 35, Article 1 becomes apparent in surveying the language of Section 4 of the article, which provides *inter alia,* "No conveyance . . ." in excess of the acreage limitation previously discussed, ". . . made to any church, religious sect, society, denomination, or to any individual church . . ., or to the trustee or trustees for either, shall fail or be declared void for insufficient dedication of the

beneficiaries in, or the objects of, any trust annexed to such conveyance, . . .", in any case where lawful trustees are in existence or capable of being appointed. Under these circumstances the statute declares such conveyances to be valid.

As to what occurs when the object of the trust is so indefinite or uncertain as to be unenforceable in Equity, the statute provides a second savings clause as follows:

> ". . . [T]hen such conveyance . . . shall inure and pass to the trustee or trustees of the beneficiary church, religious sect, society, denomination, individual church, . . . to be held, managed, and the principal or income [may be] appropriated for the religious and benevolent uses of such church . . ., as such trustee or trustees may determine, *by and with the approval of the . . . authorities which, under the rules or usages of such church . . . have charge of the administration of the temporalities thereof.*
>
> "Whenever the laws, rules or ecclesiastic polity of any church . . . commits to its duly elected or appointed . . . ecclesiastical officer, authority to administer its affairs, such . . . ecclesiastical officer shall have the power to acquire by deed . . . or otherwise, any real or personal property, for any purpose authorized and permitted by its laws, rules or ecclesiastic polity, and not prohibited by the laws of West Virginia, . . ." (Emphasis supplied.)

The trustees are also given the power to hold, mortgage, sell and convey the real and personal property in accordance with church laws and as not prohibited or prevented by State law.

Aside from the obvious need for the statute as a vehicle for the holding of church property consistent with the constitutional prohibition against incorporation of church bodies, Sections 1, 3 and 4 of Article I, *Id.*, were necessary additions to statutory law to give support to beneficial ownership in church property titles for reasons appearing below.

Virginia, and West Virginia adopting the common law of Virginia, found it necessary to enact these code sections validating titles to church property because of an early decision by Chief Justice Marshall of the United States Supreme Court in *Baptist Association v. Hart's Executor,* 4 Wheat. 1 (1819). This case held that Virginia law, through certain acts of the Virginia Assembly, 13 Hening, Virginia Statutes at Large, c.17 (1789), c.15 (1791) and 1 Revised Code of Virginia (Code 1819), c.40 (effective Dec. 27, 1792), abolished all English statutes in force at a certain period prior to the fourth year of the reign of King James I. Included in that period was the enactment of the Statute of Charitable Uses, 43 Elizab., c. 4 *(1601),* VII Pickering, Statutes at Large, 43 (1793). Proceeding on that premise the Court in *Baptist Association v. Hart's Executor* held that the Statute of Charitable Uses was not in force in the State of Virginia, and that consequently a charitable trust involving property to be devoted to religious purposes would not be sustained as valid unless the trust expressly contained definite objects and purposes. This decision of Chief Justice Marshall was subsequently overruled by an opinion prepared by Associate Justice Story in 1841 in the famed *Girard Will* case, 2 How. 127, in which that Court recognized Equity's jurisdiction, independent of statute, to interpret and enforce implied charitable trusts.

Unfortunately, however, in the jurisdiction of Virginia, the damage was done; in the interim between the Marshall decision in 1819 and the *Girard* decision in 1841, the Virginia Court had occasion to address itself to the exact problem posed in the *Baptist Church* case. That Court held, in the case of *Gallego's Executors v. Attorney General,* 3 Leigh 450 (1828), that the Statute of Charitable Uses was abolished by the statute abrogating British laws, *supra,* and consequently, unspecific charitable trusts involving church property would of necessity fail in that jurisdiction. This occasioned the enactment of a statute in 1839 by the Virginia Assembly permitting trustees to

hold property for religious organizations. Code of Virginia (1849) c.77. This statute, reflecting subsequent amendments by the Virginia Assembly, was the immediate historical predecessor of *Code* 1931, 35-1-1, *et seq.* and resulted in a *pro tanto* restoration of the Statute of Charitable Uses, according to the case of *Hays v. Harris,* 73 W.Va. 17, 19, 80 S.E. 827 (1913); see generally, ZOLLMAN, AMERICAN LAW OF CHARITIES §§ 32, 34-41 (1924).

Concluding this turgid recitation of somewhat parenthetical history, suffice it to say that no conveyance, devise, bequest, dedication, by parol or otherwise, to a church organization for religious purposes will fail in the State of West Virginia because of indefiniteness so long as the conveyance is made in accordance with the dictates of *Code* 1931, 35-1-1, *et seq.* See *Sands v. Security Trust Co.,* 143 W.Va. 522, 102 S.E.2d 733 (1958), which held at page 534:

> "The incorporation in the statutory law of this State of Code, 35-1-7, has served to take away all inhibitions against the devolution of property by will or deed for religious purposes, which may have prevailed in the earlier decisions in the Courts of Virginia and in the Supreme Court of the United States."

Considering the foregoing, we believe the *Deepwater Railway* and *Carskadon* decisions are examples of this Court's early preoccupation with problems incident to the Virginia case of *Gallego's Executors v. Attorney General, supra.* While these cases coincidentally involve factual matters arising from intrachurch property disputes, they, in no respect stand for the proposition that an independent church formerly affiliated in a connectional form of government shall hold property to the exclusion of the general church in that denomination. Dictum to the contrary in the case of *Carskadon v. Torreyson,* 17 W.Va. 43 (1880) is specifically disapproved in this decision. *Id.,* at p. 94 ff.

Returning to the statute in question, *Code*, 35-1, *Id.*, Section 5 provides a method for the appointment and removal of trustees who hold property for religious purposes:

> "The . . . ecclesiastical body or individual representing any church . . . within this State . . . any individual church . . . when holding any property separately from the church, denomination, society or sect as a whole, within this State, may from time to time, and whenever occasion may arise, appoint, in such manner as such ecclesiastical body or such individual church . . . may deem proper, a trustee or trustees for its real and personal property. The body appointing may remove such trustee or trustees, . . ., and fill all vacancies caused by death, removal, or otherwise."

Section 6, *Id.* following, provides that the certificate of appointment of trustees shall be recorded in the clerk's office in the county where the church property is located.

Section 7 states further, *inter alia,* the power and responsibilities of duly appointed trustees in respect to church property: "The trustee or trustees of any church . . ., within this State," shall have power to take and hold real and personal property and to sue and be sued on account of the property they hold or claim.

This section also significantly provides in specific language: "The trustee or trustees shall be accountable to that church, religious sect, society, or denomination, or to that individual church . . ., for which he or they hold in trust, for the use and management of such property, and shall surrender it to any person or persons authorized to demand it."

Prior to the adoption of Chapter 57, Section 4, Acts of the Legislature, incorporated into the *Code* 1923, 35-1-7, this section provided for the appointment and removal of church trustees by the circuit court rather than by church organs. See *Wilsonburg Methodist Church v. Ash,* 87 W.Va. 668, 105 S.E. 915 (1921). Now it is important to note the church itself, whether it be

constituted in a form of government which is connectional and hierarchical, or congregational and autonomous, appoints and removes the trustees. Section 5 and Section 7, *supra,* clearly provide that the trustees are accountable to the church body and would be removable for causes such as termination of membership or refusal to surrender property to the church when the church called for its return. Certainly, the bridge—from the legal ownership expressly provided by statute to the beneficial ownership in the church of either form of polity—is crossed by that provision of Section 7 which demands accountability of the trustees to the church. We construe and hold, therefore, the statute means that trustees holding the legal title to church property hold it for the use and benefit of its equitable owner, the general church, when the trustee is connected in membership to a hierarchical church organization, and the individual church when the trustee is connected in membership to a congregational church organization.

Section 12 of *Code* 1931, 35-1, *supra,* is very relevant to the disposition of this case in that it provides a method to recover church property in the civil courts. It also establishes ground rules for the litigation when certain things occur which bring church property into dispute. It provides *inter alia,* as follows:

> "When any individual church, parish, con-gregation, or local branch of any religious sect, society, or denomination has become extinct, or has dissolved, or has ceased to occupy and use its property for its religious and charitable purposes, or its property may be regarded as abandoned, [a civil action may be instituted in the county where the property is located]. . . by the trustee or trustees . . ., or by any member of such individual church . . ., or by the eccle-siastical officer or religious body that by the laws of the church, religious sect, society, or denomination to which such individual church . . . belongs, has the charge or custody of such property, or in whom . . . it may be vested by the laws of such church, religious sect, society or denomination; . . . ."

The statute consecutively follows with language which provides that the court shall hear the matter and make such disposition of the property, ". . . as is allowable under the terms of the conveyance, . . . and will be in accordance with the laws of such church, religious sect, society or denomination." As indicated, the statute respects the neutral principles of property law which provide that a conveyance of property may, if properly conditioned, revert to the grantor or his heirs upon cessation of use for the purposes for which it was conveyed. The statute also provides expressly that the court shall make such disposition of the property as will be in accordance with the laws of the church, that is to say, the court will apply church law to the disposition of the property unless the language of the conveying instrument granting the property to the church expressly conditions otherwise.

The statute also provides that in such action to recover property, church laws may be accepted into the evidence and applied as follows:

> "The printed acts or laws of such church . . ., issued by its authority, embodied in book or pamphlet form, shall be taken and regarded as the laws and acts of such church, religious sect, society or denomination."

The underlying problem facing this Court is whether the pertinent sections of the statute in question, *Code* 1931, 35-1-1, *et seq.,* as amended, provide a neutral and acceptable vehicle within the meaning of the *Hull* and *Sharpsburg* cases for the determination of beneficial ownership in church property and the resolution of church property disputes without violating constitutional prohibitions.

According to the federal cases, such a statute, to pass constitutional muster, must resolve property disputes (1) without inquiry by the court into church doctrines and (2) without establishment by the court of one form of church government over a different form of church government. If the statute meets these requirements it

will be an approved method to apply neutral principles of law which neither interfere with the free exercise of religion nor establish religion, consonant with the principles announced by Mr. Justice Brennan in *Hull* and the *Sharpsburg* concurrence.

In recognition of the foregoing, we hold the West Virginia statute concerning property of religious organizations provides a neutral and acceptable vehicle for the application of church ecclesiastical law to property disputes involving churches of either connectional and hierarchical polities, or congregational and autonomous polities. Either form of church government is provided a legal means of enforcing its property rights without fear of court intrusion into matters of doctrine of the church, or from legislative interference in matters of church government. This statute also recognizes and permits enforcement of express trusts contained in conveying instruments if the trust provisions do not require inquiry into doctrine. It meets the requirements, and furthers the conditions contained therein, of West Virginia Constitution, Article III, Section 15 and Article VI, Section 47 and those of the First Amendment to the United States Constitution.

The answers to the remaining questions presented in this appeal are indicated in the case law. Two leading decisions of this Court involving predecessor organizations of The United Methodist Church, local churches and independent churches seceding from the general church, provide invaluable aid in the resolution of matters now before us. A third case, involving the same general church, classifies the form of polity to which Methodists adhere and applies rules which govern disputes in hierarchical polities.

In the very important early West Virginia case of *Venable v. Coffman,* 2 W.Va. 310 (1867), a decision was reached which was remarkably similar in content to the thrust and spirit of the *Watson* decision rendered by the United States Supreme Court some four years later. As

previously noted, the *Watson* case involved the Presbyterian Church. But, in both cases, schisms within the church arose over the slavery issue and resulting conflict continued during and after the Civil War which resulted in an active dispute over church property between groups adhering to the established church, generally aligned with northern sympathies, and the secessionist group generally aligned with southern sympathies.

In the *Venable* case, there was involved an attempt by the trustees and members of the local congregation at Lewisburg, West Virginia, to separate that local church and its property from the Methodist Episcopal Church of the United States, and to join with others in the Methodist Episcopal Church South. In 1844, some twenty-three years previous, the Methodist Church of the United States had met in Balitmore at its General Conference, and agreed upon a plan of separation which allowed certain congregations to take the church property with them to form a new church, the Methodist Episcopal Church South. When that plan of separation was agreed upon, the church at Lewisburg, though being in a contested "border conference," elected to stay with the Methodist Episcopal Church of the United States. This dispute in the case occurred when a subsequent attempt was made to secede *dehors* the plan of separation and to take church property to the Methodist Episcopal Church South. This Court did not permit the church property to go with the southern congregation, holding at pages 319-20:

> ". . .[T]he legal title to the church [property] in controversy became vested in trustees for the use and benefit of the congregation at Lewisburg in connection with the Methodist Episcopal Church of the United States; and that, until legally divested in some way, it must continue to be held as a trust for the use and benefit of the said church so long as it continues to have existence; . . . ."

The Court also specifically held: "An organized church cannot be divested of its property even though a majority

of its members enter into a new organization which adopts the name of the original church; provided the old organization still exists." Syllabus Point 3, *Id.*, at p. 310.

As to the rights of those who chose to leave the church, the Court said at page 320: "[A]nd that when seceders from an organized church enter into such new organization, they forfeit all claim to any interest in the former church, and lose all identity with it."

The Court went on to conclude that the particular congregation at Lewisburg, having been a church in connection with the Methodist Episcopal Church of the United States and having never changed that connection under the plan of 1844, under a means of lawful separation to the Church South, the congregation consequently continued still as a church in its original connection. The Court went on to hold further, that the proper authorities of the church in connection with the Methodist Episcopal Church of the United States, having applied for and obtained in the lower court the removal of the appellants who claimed connection with the Methodist Episcopal Church South, and for the appointment and substitution of others as trustees to hold the property in accordance with law, the lower court judgment in favor of the congregation connected with the Methodist Church of the United States was affirmed.

The very next year the Court was again faced with another dispute between adherents to the Methodist Episcopal Church of the United States and the Methodist Episcopal Church South, this time occurring in Jefferson County. The Court held in the case of *Kreglo v. Fulk,* 3 W.Va. 74 (1868), that the rule of the *Venable v. Coffman* case was controlling, and that the property in question, regardless of its holding by local trustees, did not belong to the local congregation, but rather to the church at large. The Court was not in the least troubled with the fact that the local congregation in the *Kreglo* case was divided or that it was not certain which faction represented the majority, saying, at page 83: ". . . Which of

them represents the major part of the congregation does not appear, *nor is it important,* according to the decision in the Greenbrier Church case . . . ." (Emphasis supplied.)

In addition to the important principles set forth above, the Court recognized then, as we affirm today, that those who call themselves Methodists have governed themselves since the formation of this State in a connectional and hierarchical form of church government. Further, the polity of the United Methodist Church and its predecessor organizations is readily identifiable as a hierarchical church structure. No reason for inquiry into church doctrine or interpretation of ecclesiastical law is necessary to reach this conclusion. See BOOK OF DISCIPLINE, U.M.C. (1968), *supra,* ¶ 1501. Accord, *Watson v. Jones, supra; United Methodist Church v. St. Louis Crossing Independent Methodist Church,* 276 N.E.2d 916 (Ind.App.Ct.1971); *St. John's Presbytery v. Central Presbyterian Church of St. Petersburg,* 102 So.2d 714 (Fla. 1958).

Almost half a century later, there arose another intrachurch property dispute involving the Methodist Church which again culminated in a resolution before this Court. In *Sanders v. Meredith,* 78 W.Va. 564, 89 S.E. 733 (1916), the trustees of the Westover, Monongalia County local parish of the Methodist Episcopal Church of the United States, desired to construct a church building or place of worship on property in Westover which had been previously deeded to the parsonage trustees for the specific purpose of erecting a parsonage upon the land for the use of the minister traveling the Monongalia County Circuit of the Methodist Episcopal Church. The plaintiff, a trustee of the parsonage property, sought an injunction in the Circuit Court of Monongalia County against the Church trustees to prevent them from constructing a church building on the property.

On appeal, this Court dissolved the injunction and reversed, holding for the trustees of the Church. In doing so, this Court construed *Code* 1931, 35-1-1, *et seq.*

(in its predecessor form) and recognized that the deed did not contain an express purpose that the property was to revert to the donor if it was not devoted to a certain use, saying at page 568:

> "Although the legal title to the lot is held by trustees, the deed under which they hold does not prescribe any particular use to be made of it. The trustees hold it for the benefit of an unincorporated religious society, the Methodist Episcopal Church, and the uses that can be made of it depend upon the ecclesiastical law of the Church, so far as it is not inconsistent with the law of the land. . . ."

The Court continued its discussion at that page and recognized that, although the law limits the amount of real estate that may be held by an unincorporated religious organization and prescribes ways of selling or encumbering or otherwise disposing of that real estate, the legislation also recognizes the authority to administer the affairs of the church, religious sect, society, congregation or denomination by its rules and ecclesiastical policy, is committed to a delegated or select body: "Thus does the statute law clearly recognize the right of control over church property by their governing bodies." *Id.*, at p. 569.

Following that discussion, the Court referenced the law of the governing body of the Methodist Episcopal Church and recognized that the *Discipline of the Methodist Episcopal Church* [now BOOK OF DISCIPLINE, U.M.C. (1968)] is its ecclesiastical law and it delegated to the quarterly conference (the responsible judicatory body at that time, 1916) the power to control and dispose of church property within its territorial jurisdiction. The Court speaking of the statute in question, said: "It is also an implied recognition by the legislature of the rule, frequently announced by the courts of this country, that they will not review and revise, but will respect the actions of ecclesiastical bodies in matters purely of ecclesiastical concern. . . ." *Id.*, at p. 569.

Consequently, the Court opined and held:

"The Quarterly Conference doubtless considered that the interest of the entire Church in Monongalia circuit would be promoted by the erection of a church on the parsonage lot for the use of one of its local societies at Westover. It was the proper tribunal to determine that question, according to the church discipline. It had the power to make such use of a part of its ground, and its judgment, in that respect, is not reviewable by the civil courts." *Id.*, at p. 569.

As in the case now before us, the plaintiff in the *Sanders* case strongly contended for standing to secure an injunction against the trustees of the general church based upon his interest as a contributor and as a trustee of the parsonage property and parsonage fund. The Court summarily disposed of that proposition:

"Whether plaintiff was a contributor to the parsonage fund or not, he has no such individual property right as entitles him to complain of the action of the Quarterly Conference. When he became a member of the Church, he did so upon the condition of submission to its ecclesiastical polity and jurisdiction; and, however much he may be dissatisfied with the action of its governing body, he has no right of complaint which the state courts can recognize, no individual property right being involved." *Id.*, at pp. 569-70.

The ultimate conclusion of the Court in the *Sanders* case is embodied in Syllabus Point 4, and is paraphrased here: The action of the governing body of the church in matters involving disputes over the control of church property contravenes no state law and is not subject to review by the state courts.

Returning to the facts of the case in litigation, the former trustees of the Avery United Methodist Church who are now trustees of an independent church called the Avery Chapel church, hold legal title to the property known as the Avery Church. This legal title is being held adversely to the connection which they formerly

enjoyed as trustees for the local church of The United Methodist Church. While the legal title to real and personal church property may be in the trustees, the use and beneficial ownership of the property is controlled by the usages, customs, discipline, and ecclesiastical law of the church. In a connectional or hierarchical church, the ecclesiastical law of that church determines the ownership of church property. In The United Methodist Church, a connectional and hierarchical church organization, its BOOK OF DISCIPLINE, U.M.C. (1968), ¶ 1501 prescribes that titles to the property held by trustees of a local church are held in trust for The United Methodist Church. This rule of the church, embodied as it is in the written ecclesiastical law of the church, considered in conjunction with the action of the West Virginia Annual Conference of The United Methodist Church, constitutes a judgment of a church tribunal which is absolutely conclusive upon this Court as to the matters contained therein. Therefore, this Court will enforce the decision of the church to recover the property in litigation.

We reaffirm the principles of the West Virginia and federal cases applying our respective constitutional provisions that courts, subject only to the limitations of the express trust rule and the admonition of the *Gonzalez* case, shall, in property disputes, recognize and apply the rule of the highest church judicatory passing upon the question, and that such application of church law will be enforced by the courts of this State.

This decision governs the disposition of all of the real and personal property of the Avery Church with two exceptions. First, the property described, *supra,* in the deed dated June 1, 1949 from Wilbur R. Coombs and wife to Elmer Vandervort, et al., as trustees for the Avery Church of the Methodist Church, is subject to an express trust contained in the language of the conveying instrument conditioning that property to the disciplinary use of the General Conference and the West Virginia Annual Conference of the Methodist

Church. This property, consistent with the first rule of the case of *Watson v. Jones, supra,* and *Code* 1931, 35-1-1, as amended, passes for the benefit of the general church through the language of the *deed* and not by the rule of the church. Secondly, this decision does not purport to enforce beneficial title to any personal property impressed with an express trust in the instrument or gift or dedication to specific uses inconsistent with the rule of the church. Such a trust upon personal property is not before this Court on the evidence developed in this case, but appellees concede that there may appear at a later time when the control of the property is sought to be exercised, certain items of personal property devoted to uses inconsistent with the usages of the general church.

Consistent with the rule in the *Hull* case, *supra,* this Court cannot determine the ownership of contested property in an intrachurch dispute by inquiry into matters of religious doctrine. Insofar as the West Virginia cases of *Canterbury v. Canterbury,* 143 W.Va. 165, 100 S.E.2d 565 (1957) and *Woodrum v. Burton,* 88 W.Va. 322, 107 S.E. 102 (1921) purport to resolve church property disputes based upon substantiality of departure from doctrinal beliefs of the church organization and consequently call for inquiry by the Court into the fundamental beliefs of the church organization, they are disapproved. Specifically, we overrule *Syllabus* points 2 and 4 of the *Canterbury* case and Syllabus point 2 of *Woodrum v. Burton, supra,* and the supporting language contained in those cases.

Explicit and implicit in the assertions of the appellants is the argument of their right to withdraw from The United Methodist Church because of differences in theology and in matters of church organization in relation to membership participation. These are matters so intertwined in church doctrine and so exhaustively covered in the Book of Discipline, U.M.C. (1968) as to prohibit inquiry by this Court. These matters are within the protected realm of the *Hull* decision. Were we

inclined to award the disputed property in this case to the independent church based upon these doctrinal matters, we would be violating the very bedrock rules of *Watson* and *Hull*. The State, through this Court, would be interfering with the free exercise of religion guaranteed in the First Amendment of the United States Constitution and Article III, Section 15 of the West Virginia Constitution.

The appellants' other major assertion is that the court should have construed *Code* 1931, 35-1-1, *et seq.* to award the control and ownership of the property to the secessionist independent church to the exclusion of the general church and in disregard of the law of the general church. If this Court were to adopt this proposition and hold it was the intent of the Legislature to award ownership of property to a local church contrary to the rule of the hierarchical church to which that local church was connected, such would be legislative interference with church affairs prohibited by the *Kedroff* case, *supra*. If this Court were to achieve the same result, absent an application of legislative interpretation, we would fall prey to the proscriptions of the *Kreshik* rule which thoroughly discredits judicial interference with the internal administration of the church as being contrary to the free exercise and establishment clauses of the United States Constitution and the West Virginia Constitution.

Though this Court is persuasively directed and emotionally attuned to the argument of appellants that the general church is appropriating to itself property acquired and improved by the sole contributions of the appellants' congregation and their ancestors, we are not legally persuaded. The rule of the *Sanders* case on this very point, as well as the strictures of *Hull*, precludes further inquiry on our part. Whether the appellants or their ancestors were contributors in property, funds, and labor in kind to the improvement of the Avery Church matters not. They have no such individual property

right as entitles them to complain of the action of the general church to retain its property. When the appellants or any of them became a member of the church, they did so upon the condition of submission to its ecclesiastical polity and jurisdiction, and however much they may be dissatisfied with the action of the general church, they assert no right which this Court can recognize.

There is also no assertion made in this case which would call for the application of the rule of *Gonzalez v. Archbishop, supra.* The appellants have not alleged or advanced with proof any fact which would tend to show the general church decision regarding the recovery of its property to have been obtained by fraud, arbitrary action or unlawful collusion. For these reasons we must respect the rule of the church as to the disposition of this property.

In conclusion the thrust of this decision almost completely closes the doors of civil courts in this State to those who would complain of a church-adjudicated ruling to their detriment. We intend it to be thus. A church decision on matters of doctrine including usage, custom, and ecclesiastical law, will be respected and enforced by our courts so long as the church involved follows its own rules.

When one joins a church and contributes of his time and property to the improvement of the church, he does so with the recognition that, as a condition of membership, he submits himself to the doctrine and rule of the church.

The century-old declaration of the Supreme Court in *Watson v. Jones* reflects our thinking that the West Virginia and United States Constitutions mandate the result of this case:

> "In this country the full and free right to entertain any religious belief, to practice any religious principle, and to teach any religious doctrine which does not violate the laws of morality and property, and which does not infringe personal rights, is conceded to all. The

law knows no heresy, and is committed to the support of no dogma, the establishment of no sect. The right to organize voluntary religious associations to assist in the expression and dissemination of any religious doctrine, and to create tribunals for the decision of controverted questions of faith within the association, and for the ecclesiastical government of all the individual members, congregations, and officers within the general association, is unquestioned. All who unite themselves to such a body do so with an implied consent to this government, and are bound to submit to it. But it would be a vain consent and would lead to the total subversion of such religious bodies, if anyone aggrieved by one of their decisions could appeal to the secular courts and have them reversed. *It is of the essence of these religious unions, and of their right to establish tribunals for the decision of questions arising among themselves, and those decisions should be binding in all cases of ecclesiastical cognizance, subject only to such appeals as the organism itself provides for."* Miller, J. in *Watson v. Jones, supra,* at pp. 728-29. (Emphasis supplied.)

The civil courts freely recognize and affirm the right of any individual or group to leave, abandon or separate from membership in a church. Upon separation, however, such person may not take with him the property of the church departed from, since such property, in absence of agreement, remains under the jurisdiction and control of the church. *Venable v. Coffman, supra; Russian Orthodox Greek Catholic St. Peter & St. Paul's Church v. Burdikoff,* 117 Ohio App. 1, 22 Ohio Ops. 2d 445, 189 N.E.2d 451 (1962), *app. dismissed,* 174 Ohio St. 140, 21 Ohio Ops. 2d 396, 186 N.E.2d 847, *cert. den.,* 374 U.S. 808, 10 L. Ed. 2d 1033, 83 S. Ct. 1694, *reh. den.,* 375 U.S. 870, 11 L. Ed. 2d 100, 84 S. Ct. 29 (1963). 66 AM. JUR. 2d, *Religious Societies* § 11 (1973).

For these reasons we affirm the judgment of the Circuit Court of Monongalia County.

*Affirmed.*

CARRIGAN, JUDGE, dissenting:

I dissent from the conclusion reached by the majority in this case.

While I concur with Points 1 and 2 of the syllabus, I am at a loss to reconcile these points with the Court's holding.

Article III, Section 15 of the West Virginia Constitution, as stated in Point 1 of the syllabus, forbids what the majority holding establishes, namely, the establishing of a form of church government.

The Avery Chapel is in the position of being told by the national body of the United Methodist Church—believe as we say you should believe, or we will take all of your property. Thus, the local congregations are forced to subscribe to beliefs and doctrines which may not coincide with theirs, under penalty of forfeiting all they have accumulated for their church over a period of years.

This, I believe, violates not only the above-mentioned provision of our Constitution but also Section 3, Article 1, Chapter 35 of our Code.

Why should the property of Avery Chapel be expropriated by the United Methodist Church when in my opinion there is no substantial showing that the state or national United Methodist Church ever contributed any money or other thing of value to Avery Chapel? I would recommend that the hierarchy of the United Methodist Church read Verse 17, Chapter 20 of Exodus, The Bible (King James Version).

Justices Carrigan and Kessel were members of the Court at the time the case was decided but departed from the Court prior to the preparation of the opinion. Justice Carrigan dissented from the decision and reserved the right to file a dissenting opinion. Justice Kessel, deeming

himself disqualified, did not participate in the consideration or decision of the case. Justices Sprouse and Neely did not participate in the consideration or decision of the case.